## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Neal Cohen; Darren Chaffee; and
SSL Assets, LLC,

                    Plaintiffs,

v.                                             CASE NO.:

Jaffe Raitt Heuer & Weiss, P.C.;
Jeffrey M. Weiss; Lee B. Kellert;
and Deborah L. Baughman,

                    Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

For their complaint, Plaintiffs allege as follows:

### PARTIES

1.     Neal Cohen and Darren Chaffee are citizens of New York.

2.     SSL Assets, LLC ("SSL") is a limited liability company organized under the laws of the State of Delaware. Its members are Neal Cohen and Darren Chaffee. Therefore, SSL is a citizen of New York.

3.     Jaffe, Raitt, Heuer & Weiss, P.C. is a professional corporation incorporated in Michigan with its principal place of business in Michigan.

4.     Jeffrey M. Weiss, Lee B. Kellert, and Deborah L. Baughman are citizens of Michigan.

1

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     This Court has personal jurisdiction over Defendants.

7.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## GENERAL ALLEGATIONS

### Background

8.     Neal Cohen and Darren Chaffee are in the business of acquiring underperforming businesses from large multinational corporations, often through their affiliates CoBe Capital LLC ("CoBe") and CoBe Management LLC ("CoBe Management").

9.     In December 2012, Mr. Cohen and Mr. Chaffee became interested in a potential transaction involving the purchase of LSI Corporation of America, Inc. ("LSI Corp.").

10.    At that time, LSI Corp. was wholly owned by a subsidiary of HNI Corporation ("HNI").

11.    In January 2013, Mr. Cohen and Mr. Chaffee began discussions with HNI for the purchase of LSI Corp. In the course of these discussions, Mr. Cohen and Mr. Chaffee learned that LSI Corp. sponsored a multi-employer defined

2

benefit pension plan for its union employees, the Carpenter Labor-Management Pension Fund (the "Pension Fund"), and that the Pension Fund was underfunded.

12.    Mr. Cohen and Mr. Chaffee knew that a company who participates in an underfunded multi-employer defined benefit pension plan could face withdrawal liability if, among other situations, the company stopped contributing to the plan.

<u>Cohen and Chaffee Seek Jaffe's Advice Regarding LSI Corp.</u>

13.    Mr. Cohen and Mr. Chaffee had an existing relationship with the law firm of Jaffe, Raitt, Heuer & Weiss, P.C. ("Jaffe") prior to contacting Jaffe regarding the LSI Corp. deal.

14.    Mr. Cohen and Mr. Chaffee had previously received legal advice from Jeffrey Weiss, a partner at Jaffe, regarding one other potential transaction, although this transaction never was completed.

15.    No Plaintiff ever had a written engagement letter with the Jaffe firm regarding any matter. All of Jaffe's legal services were performed without any written engagement letter defining the scope of Jaffe's representation.

16.    On April 4, 2013, Mr. Chaffee e-mailed Mr. Weiss and requested legal services regarding the then-pending LSI Corp. deal. Mr. Cohen and Mr. Chaffee sought Mr. Weiss's counsel because they believed Jaffe had expertise in union-related legal issues. *See* (Exhibit A).

CORE/3004695.0003/122003603.1

17.     In this e-mail, Mr. Chaffee explained that he and Mr. Cohen knew LSI Corp. was exposed to multi-employer withdrawal liability and they needed Jaffe and Mr. Weiss to advise them on how to avoid having this liability attach to their other entities. Mr. Chaffee advised Mr. Weiss that as of December 2012, LSI Corp. had approximately $3.9 million in pension withdrawal liability, and forwarded to Mr. Weiss a memo with information on LSI Corp. and CoBe's letter of intent to purchase LSI Corp.

18.     Specifically, Mr. Chaffee advised Mr. Weiss that, in part, "[o]ne of the big issues in this deal is that the facility is union and they sponsor a multi-employer pension plan. The potential clawback on the withdrawal liability is a risk that HNI has. We also want to be sure that we aren't personally liable or put our other assets/companies at risk."

19.     According to its billing records, Jaffe began working on the LSI Corp. matter on April 4, 2013. As reflected in Jaffe's first invoice regarding the LSI Corp. matter, two days after Mr. Chaffee's initial e-mail, Mr. Weiss, Mr. Cohen, and Mr. Chaffee discussed the withdrawal liability in a conference call. Mr. Kellert worked on the withdrawal liability issue the following day. Ms. Baughman also answered Mr. Cohen's and Mr. Chaffee's questions regarding the withdrawal liability.

4

20.    The key legal issue for Mr. Cohen and Mr. Chaffee, as they communicated to Mr. Weiss, was avoiding controlled group liability for Mr. Cohen's and Mr. Chaffee's other entities. "Controlled group liability" is a term of art in the context of pension withdrawal liability, and refers to pension withdrawal liability that attaches to entities other than the particular company that has stopped participating in the pension plan.

21.    Jaffe knew at all times that its legal advice regarding controlled group liability and pension withdrawal liability was intended not solely for the benefit of LSI Corp. but was primarily for the benefit of Mr. Cohen, Mr. Chaffee, and all of their other entities. These other entities were named, as a class, in Mr. Chaffee's April 4, 2013 e-mail as beneficiaries of Jaffe's legal advice where Mr. Chaffee said "We also want to be sure that we aren't personally liable or put our other assets/companies at risk."

22.    At all times, Mr. Cohen and Mr. Chaffee reasonably believed that Jaffe was providing legal advice for their benefit as individuals and for their benefit as the owners of other entities potentially subject to pension withdrawal liability.

23.    Mr. Weiss and Jaffe knew from the details surrounding the LSI Corp. acquisition that LSI Corp. was an underperforming company at substantial risk of failure, and it was reasonably foreseeable that LSI Corp. might in the future be

5

unable to continue making contributions to the Pension Fund and thereby trigger pension withdrawal liability.

24.     Jaffe advised Mr. Cohen and Mr. Chaffee that they could acquire LSI Corp. without subjecting their other entities to controlled group liability if no one person owned at least 80% of LSI Corp.

25.     Because Mr. Cohen and Mr. Chaffee were so cautious regarding controlled group liability, they decided that no one person would have control of LSI Corp., and agreed upon a 49%, 49%, 2% ownership structure (with Ryan Fishoff, a former CoBe employee whose interest was later bought out, having the 2%).

26.     Jaffe, acting primarily through Mr. Weiss, formed LSI of America Holdings LLC ("LSI Holdings") and drafted all documents relating to its formation, including an operating agreement providing that Mr. Cohen owned 49%, Mr. Chaffee owned 49%, and Mr. Fishoff owned 2%. The management of LSI Holdings requires a 67% ownership interest to approve any act of the members.

27.     According to Jaffe, this particular structure for the ownership and management of LSI Holdings would avoid controlled group liability for Mr. Cohen's and Mr. Chaffee's other entities because, among other reasons, no single person had 80% or more control over LSI Holdings.

6

28.     Prior to the close of the LSI Corp. acquisition, no lawyer at Jaffe ever asked Mr. Cohen and Mr. Chaffee for information regarding their ownership interests in entities other than the to-be-formed LSI Holdings.

29.     Before Mr. Cohen and Mr. Chaffee signed the LSI Holdings operating agreement, they again asked Mr. Weiss whether the proposed structure prevented controlled group liability. Mr. Weiss told Mr. Cohen and Mr. Chaffee: "I think we should finalize and execute this agreement.  We can move ownership into separate single member LLCs in the future but I don't think that helps insulate liability in any meaningful way.  **Personal liability is limited by the existing structure – operating company wholly owned by an LLC – and the ownership of the holding company avoids any controlled group issues**." *See* (Exhibit B) (June 18, 2013 e-mail) (emphasis added).

30.     On June 18, 2013, relying on Mr. Weiss's advice, Mr. Cohen and Mr. Chaffee acquired LSI Corp. from HNI, through LSI Holdings. Mr. Cohen and Mr. Chaffee subsequently signed the LSI Holdings operating agreement.

31.     At the time that Mr. Cohen and Mr. Chaffee acquired LSI Corp., they knew that LSI Corp. had a pension withdrawal liability of approximately $3.9 million but believed, in reliance on Jaffe's advice, that they had no personal liability and none of their other entities had any controlled group liability.

32.    If Jaffe had told Mr. Cohen and Mr. Chaffee that purchasing LSI Corp. would expose their other entities to controlled group liability, Mr. Cohen and Mr. Chaffee would not have closed the purchase.

<u>Jaffe Continues to Advise Mr. Cohen and Mr. Chaffee on Pension Withdrawal Liability and LSI Corp. Matters</u>

33.    After the LSI Corp. acquisition date, Jaffe continued to provide advice, and continued to bill for providing advice, regarding the pension withdrawal liability and controlled group liability issues.

34.    On August 1, 2013, Mr. Chaffee e-mailed Mr. Weiss regarding a New York Times article that discussed a court ruling regarding private equity fund liability for unfunded pensions of bankrupt companies. Mr. Chaffee asked Mr. Weiss to reconfirm that they were protected under the LSI Corp. structure: "Is there anything that Neal / CoBe Capital needs to take into consideration regarding our ownership structure for LSI?" *See* (Exhibit C) (August 1, 2013 e-mail).

35.    On August 5, 2013, as a follow-up to the previous e-mail, Mr. Chaffee sent Mr. Weiss the management services agreement between LSI Corp. and CoBe Management, as well as charts showing Mr. Cohen's ownership interests in various entities and the legal structure of CoBe. *See* (Exhibit C) (August 5, 2013 e-mail).

36.    On August 16, 2013, Mr. Chaffee followed up via e-mail with Mr. Weiss regarding the question as to whether the management agreement between LSI Corp. and CoBe Management affected "our structure and/or CoBe Capital."

8

Mr. Weiss responded via e-mail that he had shared Mr. Cohen and Mr. Chaffee's legal structure and management agreement with his "ERISA partner," but she had not reached a decision and Mr. Weiss thought the request had fallen "through the cracks." Mr. Weiss promised to follow up. *See* (Exhibit D) (August 16, 2013 5:07 PM e-mail). Mr. Weiss, Mr. Cohen, and Mr. Chaffee subsequently spoke on August 21, 2013.

37.     On October 30, 2013, Mr. Chaffee asked Mr. Weiss via e-mail about structuring possible add-on acquisitions for LSI Corp. Mr. Chaffee told Mr. Weiss that he wanted "to ask you a question about structuring, given the multi-employer pension plan." *See* (Exhibit E).

38.     The next day, Mr. Chaffee and Mr. Weiss discussed the contours of controlled group liability over a phone call. Mr. Weiss sent Mr. Chaffee an e-mail saying: "We have reviewed the controlled group issue that we discussed earlier and have concluded that if (1) a seller retains more than 20% of the equity of the business, (2) such equity is non-voting and (3) we have the right to repurchase such equity at some agreed upon price or formula, then the acquired business will not be part of the LSI controlled group unless and until the repurchase right is exercised." *See* (Ex. F) (October 31, 2013 e-mail).

39.     On November 4, 2013, Mr. Chaffee replied and asked Mr. Weiss whether the controlled group analysis would be impacted if some of the LSI Corp.

9

revenues were moved to a new facility with a different business. Mr. Weiss replied that this would "have no effect on the control group issue." *See* (Exhibit F) (November 5, 2013 12:19 PM e-mail).

40.     Although Mr. Cohen and Mr. Chaffee ultimately never purchased any add-on acquisitions, they relied on Jaffe's assurance in continuing to manage LSI Corp., unaware of their other entities' mounting exposure to the controlled group liability.

41.     During the period that Mr. Cohen and Mr. Chaffee were unaware of their exposure to controlled group liability, they transacted in the ordinary course of their business without any knowledge of the effect of their transactions upon the LSI Corp. controlled group.

42.     In May 2014, as part of LSI Corp.'s administration of employee benefits, LSI Corp. had to confirm to a third-party that it was not in a controlled group with any other entity.

43.     On May 2, 2014, Mr. Chaffee forwarded to Mr. Weiss and to Mr. Kellert a request from an insurance agency for LSI Corp. to verify that it was not in a controlled group with CoBe or any other entity. Because Jaffe had repeatedly assured Mr. Chaffee that there was no controlled group liability, Mr. Chaffee commented "I believe I can confirm that we are not a control group per this IRS

code section." Nevertheless, Mr. Chaffee asked Mr. Weiss and Mr. Kellert to confirm this. *See* (Exhibit G) (May 2, 2014 e-mail).

44.    Mr. Weiss replied on May 5, 2014, and told Mr. Chaffee: "You are correct that LSI is not part of a controlled group with COBE or any other entity." *See* (Exhibit G) (May 5, 2014 e-mail).

45.    On May 15, 2014, Mr. Chaffee e-mailed Mr. Weiss and Mr. Kellert regarding a letter that LSI Corp. had received from the Pension Fund. According to the letter, the Pension Fund believed that LSI Corp. may have sold a facility that triggered pension withdrawal liability. Mr. Chaffee asked Mr. Weiss and Mr. Kellert for help in drafting a formal response informing the Pension Fund that no withdrawal liability had occurred because LSI Corp. had merely closed a leased facility and relocated (but not terminated) union employees. In this same e-mail, Mr. Chaffee also asked Mr. Weiss and Mr. Kellert for help in obtaining an updated estimate of LSI Corp.'s pension withdrawal liability. *See* (Exhibit H). (May 15, 2014 10:19 AM e-mail).

46.    Mr. Kellert replied and told Mr. Chaffee that he could help with both issues. Mr. Kellert drafted a response letter to the Pension Fund, and Ms. Baughman worked to obtain an estimate of the pension withdrawal liability. *See* (Exhibits H, I).

CORE/3004695.0003/122003603.1

47.    In Mr. Kellert's draft response letter, he invited the Pension Fund to contact "LSI's outside legal counsel, Jaffe, Raitt, Heuer & Weiss, P.C., directly" with any questions. LSI Corp. later sent this letter to the Pension Fund.

48.    On May 29, 2014, Mr. Chaffee e-mailed Mr. Kellert regarding an annual funding notice that LSI Corp. had received from the Pension Fund. Mr. Chaffee asked Mr. Kellert for advice regarding the Pension Fund's funding level and "[h]ow do we determine if we should be considering exiting the pension plan?" *See* (Exhibit J). (May 29, 2014 5:32 PM e-mail).

49.    Mr. Kellert forwarded Mr. Chaffee's questions to Ms. Baughman, who opined that the annual funding notice was routine and that "[t]here would still be withdrawal liability if LSI stops contributing to the fund, but the plan is relatively well funded." Ms. Baughman did not mention any controlled group liability. On May 30, 2014, Mr. Kellert forwarded Ms. Baughman's comments back to Mr. Chaffee, who told Mr. Kellert that he shared them "with the team." *See* (Exhibit J) (May 30, 2014 e-mails).

50.    Jaffe's June 5, 2014 invoice shows that Jaffe billed Mr. Cohen and Mr. Chaffee for all of the aforementioned legal advice and services provided in May 2014 pertaining to pension withdrawal liability. Jaffe billed these services to the same "COBE-LSI" matter/file number to which it had billed all previous services.

51.     In early June 2014, LSI Corp. received a surprisingly large estimate for the pension withdrawal liability of $4.62 million. Mr. Chaffee sent the estimate to Mr. Kellert and asked Mr. Kellert to see if Ms. Baughman had any thoughts. *See* (Exhibit K) (June 5, 2014 e-mail)

52.     On June 9, 2014, Mr. Chaffee received an e-mail with Ms. Baughman's analysis of the estimate, which identified an arithmetic error. The error meant the correct estimate was $4.86 million. *See* (Exhibit K) (June 9, 2014 11:31 AM e-mail).

53.     At this time, Mr. Cohen and Mr. Chaffee still believed, based on Jaffe's advice, that this withdrawal liability was confined to LSI Corp.

54.     On July 16, 2014, Jaffe sent a bill to Mr. Cohen and Mr. Chaffee for all the aforementioned legal advice and services provided during June 2014 pertaining to pension withdrawal liability. Jaffe billed these services to the same "COBE-LSI" matter/file number to which it had billed all previous services.

55.     Throughout the remainder of 2014, Mr. Cohen and Mr. Chaffee continued to manage LSI Corp., unaware that their other entities were subject to controlled group liability.

56.     In late 2014, Jaffe lawyer James Park led LSI Corp.'s union negotiations (which concluded in December 2014).

<u>Jaffe Doubles Down on its Pension Withdrawal Liability Advice</u>

13

57.     Back in September 2013, LSI Corp. obtained an asset-based working capital line of credit from Bell State Bank & Trust ("Bell State" and the "Bell State Loan," respectively) with a limit of $1.5 million.

58.     In September 2014, the Bell State Loan came due. LSI Corp. could not repay the loan.

59.     In September 2014, Mr. Cohen and Mr. Chaffee still believed, in reliance on Jaffe's legal advice, that if LSI Corp. ceased operations, the pension withdrawal liability of $4.86 million would be triggered but their other entities faced no controlled group liability.

60.     Relying on Jaffe's advice, Mr. Cohen and Mr. Chaffee decided it was a prudent business decision to invest $1.4 million to backstop the Bell State Loan and prevent LSI Corp. from failing, with the hopes of turning LSI Corp. around. Mr. Cohen and Mr. Chaffee believed their total exposure was only at most $1.4 million in the event that LSI Corp. failed.

61.     In September 2014, Jaffe organized Cocha Finance LLC ("Cocha") as a vehicle for Mr. Cohen and Mr. Chaffee to support the Bell State Loan.

62.     On December 4, 2014, Mr. Chaffee e-mailed Mr. Weiss and Mr. Kellert regarding LSI Corp.'s liquidity crunch. Mr. Chaffee told Mr. Weiss and Mr. Kellert that he had asked HNI for a bridge loan, on the theory that because HNI was also liable for the pension withdrawal liability (in a decreasing amount

CORE/3004695.0003/122003603.1

each year), HNI had an interest in ensuring LSI's continued viability. Mr. Chaffee also told Mr. Weiss and Mr. Kellert that HNI had taken the position that CoBe was also responsible for part of the pension withdrawal liability: "Travis believe, and I think he is wrong, that we 'CoBe Capital' is also on the hook for part of the pension withdrawal liability. I know we went round and round on this very topic when structuring the deal, but the question is to reconfirm this point again – that we have no liability with the PWL." (errors in original). *See* (Exhibit L).

63.    On December 5, 2014, Mr. Kellert replied to Mr. Chaffee, in part: "Sorry for the delay.  I was just making sure that I had the facts and the law correct.  Although you are correct that we do not believe that Cobe has any direct (the plan administrator can always make an alter ego claim) exposure for the pension withdrawal liability (and the Sun Capital case was not overturned, the Supreme Court declined to hear the case, so the 1st Circuit ruling stands), we do not think you can take the position that HNI/Sagus is liable for a portion of the withdrawal liability." *See* (Exhibit M).

64.    On January 23, 2015, Jaffe sent a bill to Mr. Cohen and Mr. Chaffee for all the aforementioned legal advice and legal services provided from September 5, 2014 through December 11, 2014, including those pertaining to pension withdrawal liability. Jaffe billed these services to the same "COBE-LSI" matter/file number to which it had billed all previous services.

<u>Damages</u>

65.     On September 30, 2014, when the Bell State Loan matured, Mr. Cohen and Mr. Chaffee loaned $1.4 million to Cocha, which pledged its assets to Bell State in support of the Bell State Loan.

66.     On February 3, 2015, Mr. Cohen and Mr. Chaffee loaned an additional $200,000 to Cocha, which pledged its assets to Bell State in support of the Bell State Loan.

67.     After February 3, 2015, Mr. Cohen and Mr. Chaffee learned that Jaffe's legal advice regarding controlled group liability was incorrect and that certain of their other entities in fact faced controlled group liability.

68.     LSI Corp. continued to need cash to avoid insolvency. At this point, Mr. Cohen and Mr. Chaffee had to decide whether to let LSI Corp. fail, which would result in a certain $6.4 million loss ($1.6 million loss of investment plus a $4.86 million controlled group liability), or whether to continue to support LSI Corp. in the hope that the business could be turned and doing so would be less damaging. Mr. Cohen and Mr. Chaffee chose the latter.

69.     Mr. Cohen and Mr. Chaffee to date have spent at least $4.95 million supporting LSI Corp, and none of that investment is recoverable.

70.     Despite Mr. Cohen's and Mr. Chaffee's efforts, LSI Corp. was ultimately unable to remain solvent. Mr. Cohen and Mr. Chaffee were forced to mitigate their losses by refusing to invest further monies into LSI Corp.

71.     LSI Corp. was placed into receivership on January 15, 2016. To date, receivership costs have amounted to at least $480,000.

72.     Because LSI Corp. has terminated most of its workforce and withdrawn from the Pension Fund, the Pension Fund has begun the process of assessing withdrawal and controlled group liability.

73.     LSI Corp. has been in a controlled group with at least one other of Mr. Cohen's and Mr. Chaffee's entities since the June 18, 2013 acquisition of LSI Corp. through the date of this Complaint.

74.     SSL is currently in the controlled group with LSI Corp.

75.     As a result of SSL's inclusion in the controlled group with LSI Corp., SSL will be liable for any pension withdrawal liability of LSI Corp.

76.     The Pension Fund is currently investigating whether it can assess withdrawal liability against HNI. On March 10, 2016, HNI notified LSI Holdings of a claim by HNI for indemnification pursuant to the purchase agreement for LSI Corp., under which LSI Holdings agreed to indemnify HNI for any damages HNI might suffer as a result of LSI Corp.'s withdrawal from the Pension Fund.

CORE/3004695.0003/122003603.1

77.     If the Pension Fund assesses withdrawal liability against HNI, LSI Holdings may be obligated to indemnify HNI.

78.     If Jaffe had correctly advised Mr. Cohen and Mr. Chaffee as to the potential for controlled group liability, Mr. Cohen and Mr. Chaffee would not have purchased LSI Corp.

79.     If Jaffe had correctly advised Mr. Cohen and Mr. Chaffee as to the potential for controlled group liability, Mr. Cohen and Mr. Chaffee would not have spent $4.95 million in supporting LSI Corp.

80.     If Jaffe had correctly advised Mr. Cohen and Mr. Chaffee as to the potential for controlled group liability, Mr. Cohen's and Mr. Chaffee's other entities would not now be liable for the pension withdrawal liability of approximately $4.86 million.

81.     If Jaffe had correctly advised Mr. Cohen and Mr. Chaffee as to the potential for controlled group liability, Mr. Cohen and Mr. Chaffee would not have incurred at least $480,000 in receivership costs associated with terminating LSI Corp.'s operations.

## COUNT 1: LEGAL MALPRACTICE (NEGLIGENCE)

82.     Plaintiffs incorporate all of the preceding allegations as if set forth herein.

83.     Defendants had an attorney-client relationship with Plaintiffs.

CORE/3004695.0003/122003603.1

84.     Defendants owed Plaintiffs a duty to use and exercise reasonable skill, care, discretion, and judgment in the provision of legal services.

85.     Defendants failed to exercise reasonable skill, care, discretion, and judgment by, among other things: (1) failing to investigate facts necessary to competently opine on controlled group liability; (2) incorrectly advising Plaintiffs as to the rules for controlled group liability; (3) structuring the LSI Corp. transaction and LSI Holdings in a manner that did not avoid controlled group liability; (4) failing to advise Plaintiffs that the then-proposed LSI Corp. acquisition could not be completed without exposing Mr. Cohen's and Mr. Chaffee's other entities to controlled group liability; and (5) repeatedly advising Plaintiffs after the LSI Corp. acquisition that there was no controlled group liability.

86.     As a direct and proximate result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial, but not less than $10.29 million.

## COUNT 2: BREACH OF CONTRACT

87.     Plaintiffs incorporate all of the preceding allegations as if set forth herein.

88.     A contract existed between Mr. Cohen and Mr. Chaffee and Defendants in which Defendants promised to structure the LSI Corp. acquisition in

CORE/3004695.0003/122003603.1

a manner such that Mr. Cohen's and Mr. Chaffee's other entities would not be in the LSI Corp. controlled group.

89.   Defendants also promised to structure the LSI Corp. acquisition for the direct benefit of a designated class of persons, namely, all other entities owned by Mr. Cohen or Mr. Chaffee. The benefit was that these entities would not be in the LSI Corp. controlled group.

90.   The parties to this contract intended all of the other entities owned by Mr. Cohen or Mr. Chaffee to be third-party beneficiaries to the contract, because these entities as a specifically designated class of persons would be harmed if Defendants' failed to fulfill their promise under the contract.

91.   Defendants breached this contract by structuring the LSI Corp. acquisition in a manner that caused Mr. Cohen's and Mr. Chaffee's other entities to be in the LSI Corp. controlled group.

92.   As a result of Defendants' breach of contract, Plaintiffs have been damaged in amount to be proven at trial, but not less than $10.29 million.

## PRAYER FOR RELIEF

Plaintiffs request judgment in their favor against Defendants for damages in an amount to be proven at trial and any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all issues triable by jury.

.  .  .  .

.  .  .  .

.  .  .  .

.  .  .  .

.  .  .  .

Dated:  <u>April 25, 2016</u>

Respectfully submitted,

FOR PLAINTIFFS:

<div style="margin-left: 45%;">

<u>s/ Jeffrey J. Goulder</u>
JEFFREY J. GOULDER (AZ 010258)
MICHAEL VINCENT (AZ 029864)
Stinson Leonard Street LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
(602) 279-1600
E-mail: jeffrey.goulder@stinson.com
         michael.vincent@stinson.com

MARK S. BAUMKEL (P27613)
Co-counsel for Plaintiffs
30200 Telegraph Road, Suite 200
Bingham Farms, MI 48025
(248) 642-0444
E-mail: markbaumkel@gmail.com

</div>

22