UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEAL COHEN, DAREN CHAFFEE,
AND SSL ASSETS, LLC,

        Plaintiffs,

                               Case No. 16-CV-11484

vs.

                               HON. GEORGE CARAM STEEH

JAFFE, RAITT, HEUER & WEISS, P.C.,
JEFFREY M. WEISS, LEE B. KELLERT
AND DEBORAH L. BAUGHMAN,

        Defendants,

JAFFE, RAITT, HEUER & WEISS, P.C.,

        Third-Party Plaintiff,

vs.

COBE CAPITAL, LLC,

        Third-Party Defendant.
_____/

OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [DOC. 30] AND GRANTING IN PART AND
DENYING IN PART PLAINTIFFS' AND THIRD-PARTY DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 31]

     This is a legal malpractice and breach of contract action.  Plaintiffs

Neal Cohen, Darren Chaffee and one of their businesses, SSL Assets,

allege that they hired defendant law firm Jaffe, Raitt, Heuer & Weiss

("Jaffe"), and partners Jeffrey Weiss, Lee Kellert and Deborah Baughman to provide legal advice in connection with the possible purchase of LSI Corporation of America ("LSI"). Plaintiffs allege that Jaffe and its partners provided faulty legal advice which rose to the level of legal malpractice. The matter is before the court on plaintiffs' motion for partial summary judgment, defendants' motion for summary judgment, and third-party defendant's motion for summary judgment. The parties appeared for oral argument on the motions on May 31, 2017. For the reasons stated below, plaintiffs' motion for partial summary judgment is DENIED, defendants' motion for summary judgment is DENIED and third-party defendant's motion for summary judgment is GRANTED.

## FACTUAL BACKGROUND

Neal Cohen and Darren Chaffee are in the business of buying and turning around distressed businesses. They acquire underperforming businesses from large multinational corporations through CoBe and CoBe Management. Cohen is the owner of CoBe and CoBe Management, and Chaffee is managing director of CoBe Management with no ownership interest in either entity.

In December 2012, Chaffee began due diligence on the possible purchase of LSI Corp. ("LSI"), which was a wholly owned subsidiary of HNI

Corp.  In the course of his research, Chaffee learned that LSI sponsored a multi-employer defined benefit pension plan for its union employees, and that the pension fund was underfunded.  Chaffee learned that companies who participate in underfunded pension plans could face pension withdrawal liability if the company stops contributing to the plan, such as by ceasing operations and laying off its employees.  Chaffee read articles related to pension withdrawal liability, including one from Skadden Arps that discussed a court opinion that decided the investment activities of a private equity fund did not constitute a "trade or business" and therefore did not subject the fund to joint and several liability as a controlled group. Controlled group liability is an ERISA concept whereby other entities can be responsible for the pension withdrawal liability of the sponsor of a pension plan based on common ownership.  Cohen and Chaffee learned that the most recent estimate of LSI's pension withdrawal liability was $3.9 million.  Their primary concern was to ensure that this liability was confined to LSI and would not spread to themselves or their other companies.

Chaffee emailed Jeffrey Weiss on April 4, 2013 regarding the pending LSI deal.  Weiss had rendered legal advice to Cohen and Chaffee in a prior attempted business acquisition.  Chaffee explained that LSI was exposed

to pension withdrawal liability of $3.9 million and he wanted advice regarding how to avoid having that liability attach to their other companies.

> One of the big issues in this deal is that the facility is union and they sponsor a multi-employer pension plan. The potential clawback on the withdrawal liability is a risk that HNI [the seller] has. We also want to be sure that we aren't personally liable or put our other assets/companies at risk. We'll want to discuss this further. I understand the risk around this pretty well because we've been researching it.

(Plaintiffs' Ex. D) The subject line of the email was "CoBe Capital".

Shortly after the April 4, 2013 email, Chaffee believes that he and Weiss had an initial telephone call where they likely discussed the pension withdrawal liability issue. (Chaffee dep. 68-69). Chaffee and Cohen understood that Jaffe was protecting both their personal interests and their other businesses, including SSL Assets. At his deposition, Weiss testified that he understood that Cohen and Chaffee sought Jaffe's legal advice to be sure that they would not face liability associated with the pension withdrawal liability issue, either personally or on behalf of their other assets. (Weiss dep. 49-52). Jaffe did not provide an engagement letter for the services provided in connection with the LSI deal. (Weiss dep. 29).

Controlled groups are determined by the ownership percentages in the entities involved. In order to render an opinion on whether Cohen and Chaffee's other companies were part of a controlled group, Weiss asked

Chaffee if he and Cohen had common ownership in any entities.  (Weiss dep. 41).  Weiss does not recall explaining to Chaffee what "common ownership" meant for purposes of a controlled group liability analysis. (Weiss dep. 78).  According to Weiss, Chaffee said that he and Cohen did not have common ownership in any entities.  (Weiss dep. 41).  Weiss did not obtain any other information to evaluate the issue of controlled group liability prior to the closing of the LSI purchase.  (Weiss dep. 44).

Jaffe never asked Cohen or Chaffee prior to the close of the LSI purchase for a written organizational chart listing the companies in which Cohen and Chaffee had an ownership interest.  No lawyer at Jaffe ever asked Cohen or Chaffee for a list of the other companies they owned.

Weiss drafted an operating agreement for LSI Holdings of America LLC ("LSI Holdings"), specifying that Cohen was to own 49% of LSI Holdings, Chaffee 49%, and a third investor 2%.  The LSI deal was closed on June 18, 2013, at which time Weiss advised Chaffee, "I think we should finalize and execute this agreement . . . the ownership of the holding company avoids any controlled group issues."  (Doc. 1-2 at 5).

In September of 2014, Chaffee and Cohen formed Cocha Finance, LLC ("Cocha") to secure a $1.5 million asset-based working capital line of credit that LSI had taken from Bell State Bank & Trust.  Despite the

investment, by December of 2014, LSI had run out of money. On December 4, 2014, Chaffee emailed Weiss and attorney Kellert to reconfirm the controlled group liability issue: "Travis believe[s], and I think he is wrong, that we 'CoBe Capital' is also on the hook for part of the pension withdrawal liability. I know we went round and round on this very topic when structuring the deal, but the question is to reconfirm this point again – that we have no liability with the PWL." (Doc. 1-2 at 36). On December 5, 2014, Kellert replied to Chaffee, confirming "[Y]ou are correct that we do not believe that Cobe has any direct (the plan administrator can always make an alter ego claim) exposure for the pension withdrawal liability . . . ." (Doc. 1-2 at 38).

At this time, LSI sought advice from the Stinson Leonard Street, LLP ("Stinson") law firm about the option of filing bankruptcy. From discussions with the Stinson law firm in January 2015, Cohen and Chaffee learned that because they shared ownership interests in SSL Assets through their individual holding companies, SSL Assets was in a controlled group with LSI and LSI Holdings.

Over the course of the next eight months, Cohen and Chaffee invested an additional $3.25 million in LSI to sustain the company. Nevertheless, in January 2016, LSI was forced to terminate its entire union

workforce, thereby constituting a complete withdrawal from the pension fund. This triggered LSI's pension withdrawal liability, and SSL's corresponding controlled group liability. LSI's, and therefore SSL Assets', withdrawal liability is $3,259,960. (Ex. 16, Timothy Geddes Decl.) Chaffee testified they would not have purchased LSI if Jaffe had advised them that SSL Assets would be in a controlled group with LSI. (Chaffee dep. 151).

In his deposition, Weiss admitted that when he was representing Cohen and Chaffee he did not have a "legally accurate" understanding of the meaning of "controlled group liability." (Weiss dep. 13). Because he did not feel competent to assess controlled group liability, he relied on his partner Baughman to perform the analysis. (Weiss dep. at 14, 59). Weiss testified that Baughman told him what information she would need to conduct the controlled group analysis. (Weiss dep. 59-60). Baughman testified that she relied on Weiss to provide the necessary facts for her to perform a controlled group analysis, but denies that she told Weiss what questions to ask. (Baughman dep. 15-16, 19). Baughman recalled Weiss orally informing her of the ownership structure of LSI Holdings, but not of any other companies. (Baughman dep. 16). Baughman told Weiss there was no LSI controlled group beyond LSI Holdings. (Baughman dep. 18).

In late 2014, Jaffe represented LSI in conducting negotiations with LSI's labor union. Weiss testified that LSI Holdings was Jaffe's client for services rendered in connection with the union negotiations. On January 23, 2015, Jaffe sent a bill to CoBe for legal services, in the amount of $92,422.00, provided from September 5, 2014 through December 11, 2014. Jaffe billed the services to the "COBE-LSI" matter/file number to which it had billed all previous services. (Ex. 8 at 34-42). In its third-party complaint, Jaffe seeks to collect its legal fees from CoBe asserting breach of contract and equitable theories.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with

"specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

ANALYSIS

Plaintiffs allege two counts in their complaint, breach of contract and legal malpractice. Plaintiffs' motion for partial summary judgment is directed at their legal malpractice claim. Defendants' motion for summary judgment is also directed at plaintiffs' legal malpractice claim. In addition, defendants seek summary judgment on plaintiffs' breach of contract claim for the reason that it is a redundant claim. Finally, third-party defendant CoBe Capital seeks summary judgment on Jaffe's third-party complaint to recover fees for legal work relating to union negotiations for LSI.

I. <u>Legal malpractice</u>

Legal malpractice requires "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3)

- 10 -

that the negligence was a proximate cause of an injury; and (4) the fact and extent of the injury alleged." *Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 586 (1994).

1.    Attorney-Client Relationship

The plaintiff must first establish the existence of an attorney-client relationship. "The general rule of law . . . dictates that an attorney may be held liable for . . . negligence only to his client, and cannot, in the absence of special circumstances, be held liable to anyone else." *Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 518 (1991).

The attorney-client relationship is governed by contract law and cannot be created absent mutual agreement to create it. *Scott v. Green*, 140 Mich. App. 384, 400 (1985). Absent a written agreement such as an engagement letter, the fact-finder must look to other evidence of the parties' mutual agreement, including "a client's subjective belief that he or she is consulting the attorney in his or her professional capacity and the client's intent to seek the attorney's professional legal advice." *People v. Crockran*, 292 Mich. App. 253, 259 (2011). "The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought

and received in matters pertinent to his profession." *Macomb County Taxpayers Ass'n v. L'Anse Creuse Pub. Sch.*, 455 Mich. 1, 11 (1997).

Today, Jaffe's firm policy is to issue written engagement letters for every representation. However, Weiss testified that Jaffe's policy regarding engagement letters for new clients did not exist in 2013 when Chaffee first emailed Weiss regarding the acquisition of LSI Corp.

Jaffe's opinion of who it represented is not consistent. In written discovery Jaffe claimed its only client was CoBe Capital. In his deposition, Weiss testified that LSI and Cocha Finance were the firm's clients. Weiss also admitted he performed work for the benefit of Cohen and Chaffee and owed them a duty of care, but denied representing them personally.

Jaffe argues that Chaffee and Cohen conducted due diligence to understand the risks associated with pension withdrawal liability and controlled group liability prior to retaining Jaffe for the acquisition of LSI Corp. However, despite knowledge and understanding of controlled group liability, neither Cohen nor Chaffee ever advised Jaffe about their ownership of SSL Assets, nor did they have any communication with Jaffe about SSL Assets. Given the complete lack of communication with Jaffe regarding SSL Assets, Jaffe argues there is no issue of material fact that SSL Assets was not a client and that any belief by plaintiffs that Jaffe

represented SSL Assets is unreasonable. Obviously this is one of many possible conclusions that could support a finding for Jaffe.

However, it is undisputed that Chaffee told Jaffe in his initial email that he was seeking legal advice in order to protect his and Cohen's other companies from LSI's withdrawal liability. The very reason Chaffee and Cohen came to Jaffe was because they lacked the legal expertise to assess their controlled group liability exposure. If Weiss or another Jaffe attorney had explained how the controlled group tests work, and what "common ownership" means for purposes of the tests, they could have discovered that Cohen and Chaffee owned three other businesses through their holding companies. One of these businesses was SSL Assets.

Regarding whether Cohen and Chaffee personally had an attorney-client relationship with Jaffe, Jaffe argues that is a non-issue because the services provided to Cohen and Chaffee as individuals are not the subject of the claim for malpractice. The court disagrees with this argument because if Cohen and Chaffee had an attorney-client relationship with Jaffe, which clearly included their seeking and receiving advice on the subject of controlled group liability, then that representation is at the very core of the malpractice claim made in this case.

The evidence shows that Weiss communicated directly with Chaffee in Weiss's role as an attorney. Chaffee advised Weiss that he was seeking legal advice to protect himself and Cohen individually, as well as their other assets and companies. The court finds that Chaffee and Cohen were clients of defendants. There is an issue of fact whether Jaffe and the individual defendants represented SSL Assets

2. <u>Standard of Care</u>

Controlled group liability is the product of two ERISA statutes. First, an employer who participates in a multi-employer pension plan but withdraws from the plan is liable for the employer's share of any underfunded benefits. This concept is known as "pension withdrawal liability." 29 U.S.C. 1381(a). Second, all businesses that are "under common control" are treated as a single employer and share the pension withdrawal liability jointly and severally. This concept is called "controlled group liability." 29 U.S.C. 1301(b)(1); 29 C.F.R. 4001.3(a)(1), (2).

Whether businesses are under common control depends on I.R.C. regulations. 29 C.F.R. 4001.3(a)(1). There are two alternative tests for common control: (1) the parent-subsidiary test and (2) the brother-sister test. The parent-subsidiary test provides that if a parent directly or indirectly owns at least an 80% controlling interest in a subsidiary, then all

subsidiaries and the parent are under "common control."  26 C.F.R. 1.414(c)-2(b).  The brother-sister test, which analyzes ownership percentages to determine if independent companies are deemed to be under common control, is the test that plaintiff SSL Assets violated in this case.  SSL Assets violated the brother-sister test because of the attribution rules controlling indirect ownership.  Any ownership interest in a company that is held by a partnership or corporation is deemed to be proportionally owned by that partnership or corporation's partners or owners (as long as they have at least a 5% stake).  26 C.F.R. 1.414(c)-2(b), 1.414(c)-4(a), (b)(2), (b)(4).

Since 2011, SSL Assets has been owned 95% by Sendori Acquisitions, LLC and 5% by Luz Place, LLC.  Sendori is owned 100% by Neal Cohen and Luz Place is owned 100% by Darren Chaffee.  Under the attribution rules, SSL Assets is deemed to be owned directly by Cohen (95%) and Chaffee (5%).  LSI is deemed to be owned directly by Cohen (49%) and Chaffee (49%) because the LSI holding company is LSI Holdings of America LLC, which is owned 49% by Cohen and 49% by Chaffee.

Under the brother-sister test and its attribution rules, LSI and SSL are deemed to be in the same controlled group, and are considered a single

employer for pension withdrawal liability purposes, because Cohen and Chaffee owned 80% controlling interests in, and had 50% "effective control" of, both companies.   26 C.F.R. 1.414(c)-2(c)(1).  "Effective control" requires identical ownership across LSI and SSL Assets that exceeds 50%. Identical ownership means that each owner's interest counts toward the 50% total only to the extent that owner's interest is identical across all of the companies.

| Owner | LSI Holdings | SSL Assets | Identical Ownership in Both LSI & SSL |
|---|---|---|---|
| Neal Cohen | 49% | 95% | 49% |
| Darren Chaffee | 49% | 5% | 5% |
| Ryan Fishoff | 2% | 0% | 0% |
| Totals: | 100% | 100% (must be ≥80%) | 54% (must be ≥50%) |

To properly advise on controlled group liability, Jaffe had to understand the ownership structures of all entities in which Cohen or Chaffee had an interest, either directly or through the Internal Revenue Code attribution rules.  Weiss claims he asked Chafee in a telephone call whether he and Cohen had any common ownership in any entities and that Chaffee answered that they did not.   Weiss never explained to Chaffee how "common ownership" was determined.  Weiss admitted during his

deposition that he did not have a "legally accurate" understanding of controlled group liability, he did not feel competent to assess the issue, and he did not know the specifics of the brother-sister test.

Cohen and Chaffee each owned separate companies (Sendori and Luz Place) and those companies owned SSL Assets. Cohen and Chaffee did not have individual ownership interests in any of the same companies. Therefore, it may have been reasonable that Chaffee answered the question he was asked by Weiss the way that he did. The only reason Cohen and Chaffee are deemed to have common ownership in SSL is because of the attribution rules, which Weiss never explained to them.

Weiss' partner Baughman did understand the attribution rules, but she did not have any contact with Cohen and Chaffee prior to the close of the LSI deal. Baughman did not know what questions Weiss asked Cohen and Chaffee to gather information for the controlled group analysis. She also testified that she did not provide any guidance on what to ask because she thought Weiss already knew what information she needed to do the analysis. Baughman testified that she relied exclusively on Weiss to bring her the relevant information. However, when Weiss was shown an organizational chart for Cohen and some of plaintiffs' companies at his

deposition, he admitted he could not identify what information would be important or relevant to a controlled group analysis.

Defendants argue that because Chaffee had performed extensive due diligence on pension withdrawal liability and controlled group liability issues before retaining Jaffe, and because Chaffee is a Certified Public Accountant and a Chartered Financial Analyst, Chaffee cannot claim ignorance as to the concept of attribution of ownership. Defendants argue there is an issue of fact whether Jaffe breached the standard of care in this case. Jaffe's standard of care expert, Jordan Schreier, who was not deposed, opined that Weiss' question about common ownership was sufficient to meet the standard of care for an attorney: "[I]t is my opinion that Jeffrey M. Weiss met the standard of care for legal practice when he asked whether Mr. Chaffee and Mr. Cohen had common ownership in any entity, and that Mr. Chaffee had the information and sophistication he needed to provide an accurate response but did not and it was reasonable for Mr. Weiss to rely on Mr. Chaffee's response." (Ex. I, Schreier Aff. at 7; Ex. 1 to Aff. at p. 9-10). Defendants also cite to Schreier's opinion to support a finding that Baughman's reliance on Weiss to obtain the information she needed to analyze whether there was potential for controlled group liability is not a breach of the standard of care.

Weiss admittedly did not explain the applicable attribution rules to Chaffee, and Chaffee testified he did not know the attribution rules. Jordan Schreier has no basis for assessing Chaffee's knowledge. It is outside his qualifications as a legal standard of care expert to offer an opinion on a lay witness's knowledge. Fed. R. Evid. 702. Schreier's opinion that Weiss was justified in assuming Chaffee understood the brother-sister test was based on an internal email Chaffee sent to Cohen. However, Weiss did not see this email until it was produced in discovery, so it cannot justify Weiss's conduct in advising Chaffee. In addition, the email is a copy of an article Chaffee read and may be considered as evidence from which it can be inferred that he understood the concepts discussed, but that is not a necessary inference.

Where there is an attorney-client relationship, an attorney has a "duty to use and exercise reasonable skill, care discretion and judgment" and plaintiffs argue that Weiss fell below this standard of care when he did not explain the attribution rules to Cohen and Chaffee, yet assured them that there would be no controlled group liability. *Simko v. Blake*, 448 Mich. 648, 655-56 (1995).

The court finds there is an issue of fact whether defendants failed in their duty of care in providing legal advice to plaintiffs.

3. <u>Proximate Cause and Damages</u>

Plaintiffs argue that Jaffe's negligence proximately caused SSL Assets to incur $3,259,960 in damages, which is the amount SSL Assets owes to the Pension Fund as a result of being in a controlled group with LSI.  LSI completely withdrew from the Pension Fund on January 15, 2016, when it shut its operations and terminated its employees.  On that date, SSL Assets became liable by operation of law for LSI's pension withdrawal liability.  But for Jaffe's erroneous advice to plaintiffs on controlled group liability, Chaffee and Cohen contend they would not have purchased LSI.

Jaffe responds that it is speculative whether Chaffee and Cohen would have proceeded with the acquisition of LSI had they known that SSL Assets was part of a controlled group.  Jaffe points out that after being advised that SSL Assets was in a controlled group with LSI, Cohen and Chaffee made numerous investments of cash to support the loan to LSI.  Defendants allege that SSL Assets failed to take any effort to mitigate its alleged damages arising from the withdrawal from the Pension Fund.  Jaffe therefore asks the court to prohibit SSL Assets from seeking any damages related to any pension withdrawal liability.

Chaffee's first communication with Weiss made it clear that as it concerned the purchase of LSI, plaintiffs were primarily concerned with

avoiding controlled group liability personally and on behalf of their other companies.  At various other times, including the day the LSI Holdings operating agreement was finalized and later when CoBe questioned its ability to successfully turn LSI around, Chaffee asked Weiss to confirm his understanding that there was no controlled group liability.  Each time, Weiss responded that there was no controlled group and no exposure beyond LSI for the pension withdrawal liability.

Cohen and Chaffee's additional investments made after learning of SSL Asset's controlled group liability were allegedly made to prevent LSI from failing and therefore causing SSL Assets to incur pension withdrawal liability.  Before learning about the controlled group liability of SSL Assets, Cohen and Chaffee had already invested $1.4 million in LSI and were ready to put LSI into bankruptcy and cut their losses.  If LSI had not been in a controlled group with SSL Assets, LSI's failure would have cost Cohen and Chaffee the $1.4 million already invested.  But, when they realized that SSL Assets would incur controlled group liability if LSI closed down, they decided to invest additional money to attempt to save LSI.  SSL would have incurred significant harm if it had been required to incur controlled group liability, at the time estimated to be approximately $4.62 million.  Cohen and Chaffee describe making a business decision which involved making

additional investments in order to save LSI, and therefore SSL Assets. At

some point, however, it became more prudent to incur the controlled group

liability than to invest more money in LSI. For Cohen and Chaffee this

point was at $3.55 million in further investments.

Finally, plaintiffs point out that there was nothing that could be done

to extricate SSL Assets from the controlled group with LSI once it had been

created. Any after-the-fact attempts to avoid controlled group liability would

violate ERISA.

The damages sought by plaintiffs is their capital infusion of $4.95

million, the pension withdrawal liability of $3,259,960, and $480,000 in

receivership costs associated with terminating LSI's operations.

Defendants maintain that they did not cause plaintiffs to make the

additional investments in LSI that they now claim as loss of investment

damages. Defendants further argue plaintiffs should be prohibited from

claiming that their investments made after learning of SSL Assets' potential

controlled group liability was their attempt to mitigate their damages

because plaintiffs have objected to disclosing the advice they received from

counsel relative to their attempts to mitigate. At his deposition, SSL Assets'

corporate representative, Chaffee, was asked what advice he was given

with regard to mitigating damages by changing its ownership structure, but

was instructed not to answer based upon the attorney-client privilege. (Chaffee dep. 142).

Defendants contend that SSL Assets had a potential avenue for relief available that included changing its ownership structure for good faith, non-withdrawal liability reasons, after learning of Jaffe's alleged negligent advice in February 2015, but before LSI purportedly withdrew from the Pension Fund on January 15, 2016. Defendants cite to Jordan Schreier's report, which states that in certain circumstances, pension plans will settle withdrawal liability disputes for less than what was originally assessed. (Schreier Report p. 12). The argument is that if the ownership structure of SSL Assets had been changed, then the Pension Fund would have had the burden to prove it was changed to "evade or avoid" the controlled group liability. SSL Assets presumably could have used the change in ownership as leverage to negotiate down the amount of pension withdrawal liability.

Plaintiffs respond that they did not rely on any communications with counsel in deciding to make further investments in LSI, so what legal advice plaintiffs received is irrelevant. Also, plaintiffs did mitigate their damages. In addition to attempting to save LSI from closing, the withdrawal liability amount declined over time, so plaintiffs' actions had the effect of reducing SSL Asset's controlled group liability (and damages

claim) from $4.62 million to $3.26 million.  Plaintiffs further argue that they

had no legitimate business reason to reorganize the ownership interests of

LSI or SSL Assets, other than to avoid pension withdrawal liability, which is

a violation of ERISA.

The court finds there are issues of fact regarding causation,

mitigation of damages, and the amount of any damages suffered by

plaintiffs.

## II.  Breach of Contract

Plaintiffs' breach of contract claim alleges that Jaffe provided

negligent advice about controlled group liability that the plaintiffs relied

upon to their detriment.  This is the same allegation made by plaintiffs' in

their legal malpractice claim.

Michigan recognizes breach of contract claims against lawyers who

contract "to perform a specific act" as opposed to a general agreement "to

exercise appropriate skill in providing representation." *Barnard v. Dilley*,

134 Mich. App. 375, 378 (1984).  To the extent Jaffe agreed to structure

the purchase of LSI to keep Cohen and Chaffee's other companies out of

any controlled group with LSI, this was a contract to perform a specific act,

and can be the basis for a breach of contract action.

The court finds there is an issue of fact whether defendants undertook to perform a specific act and therefore denies defendants' motion for summary judgment on plaintiffs' breach of contract claim.

III. Third-Party Complaint

Jaffe brought a third-party claim against CoBe Capital for the balance of unpaid invoices for work Jaffe performed in connection with LSI's union negotiations. In late 2014, Jaffe represented LSI in negotiations with LSI's labor union. CoBe argues it is entitled to judgment as to Jaffe's third-party complaint because the balance of the attorney fees owed to Jaffe relate to services provided in connection with LSI's union negotiations and CoBe was not Jaffe's client related to those services. Even Weiss testified that Jaffe's client was LSI Holdings with respect to the union negotiations. (Weiss dep. p. 91)

In support of seeking payment for the legal fees from CoBe, Jaffe points to the fact that CoBe Management was hired by LSI to provide consulting services to better run LSI's business, and promoted the acquisition of LSI on its website. Defendants do not allege that CoBe was its client for the work represented by the bills at issue. They have not provided any legal justification or authority for seeking payment from a non-

client.  Therefore, summary judgment is GRANTED in favor of CoBe on defendants' third-party complaint.

<u>CONCLUSION</u>

For the reasons set forth in this opinion and order, plaintiffs' motion for partial summary judgment is DENIED, defendants' motion for summary judgment is DENIED and third-party defendant's motion for summary judgment is GRANTED.

Dated:  June 30, 2017

<u>s/George Caram Steeh</u>
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on June 30, 2017, by electronic and/or ordinary mail.

<u>s/Marcia Beauchemin</u>
Deputy Clerk