# EXHIBIT A

I, Andrew W. Stumpff, am over 21 years of age and if called as a witness, would competently testify to the following based on my personal knowledge:

I. QUALIFICATIONS

1. I am a Lecturer at the University of Michigan Law School, where I have taught since January, 2008, and an Adjunct Professor in the LL.M program in Taxation at the University of Alabama, where I have taught since May, 2010. I am also Of Counsel at Ann Arbor, Michigan office of the law firm of Butzel Long. My Curriculum Vitae is attached as Exhibit A.
2. I received my J.D. degree in 1986 from the University of Michigan Law School, cum laude, where I served as Article Editor of the Michigan Law Review. Following law school, I practiced employee benefits law as an associate attorney and then partner with the New York-based law firm of Davis Polk & Wardwell, with a six-year interruption from 1988, during which I practiced for two years as an employee-benefits law associate attorney with the Kansas City-based law firm of Spencer Fane Britt & Browne and served for four years in the capacities of attorney and assistant employee-benefits litigation branch chief with the Office of Chief Counsel of the Internal Revenue Service, in Washington, DC. I took a three-year hiatus from the practice of law during 2004 – 2006, during which I studied graduate computational biochemistry in the Department of Biochemistry at Michigan State University. Since 2007 I have practiced employee benefits and executive compensation law in Michigan, as a sole practitioner and later as an attorney and shareholder with the employee benefits law firm of Stevenson Keppelman Associates, and, since 2015, as Of Counsel with the firm of Butzel Long. I am a member of the Bars of New York (1987), Missouri (1989), and Michigan (2002).
3. In private practice, I have regularly advised clients on matters involving the Employee Retirement Income Security Act of 1974 ("ERISA"), including matters arising in the context of mergers and acquisitions. I have served as counsel to many clients in the negotiation and execution of corporate acquisitions and dispositions, representing both acquirors and sellers. My clients have included businesses, investors and shareholders of various types, including large public corporations, institutional investors such as

1

    investment banks and private equity investors, and individuals. I estimate that during the course of my career I have been professionally involved in approximately 100 completed acquisitions valued at at least $10 million each.

4. I have regularly taught J.D. and LL.M classes in employee benefits and executive compensation law. In my classes, I teach about the rules that apply under ERISA and the Internal Revenue Code of 1986 (the "Code"), as well as other statutes, to employee benefit plans such as pension plans and health insurance and other welfare benefit plans. My classes include coverage of the liability and insurance rules applicable to defined benefit retirement plans under Title IV of ERISA, and of legal issues that arise with respect to such plans during corporate mergers and acquisitions.

5. I have published nine law review articles, three law school casebooks (two as sole author) and a BNA Tax Management Portfolio volume on ERISA- and employee-benefits-related topics. The law school casebooks of which I am author include specific examination of issues arising in the context of mergers and acquisitions, as well as the analysis of controlled group liability under ERISA and the Code. I also have been a lecturer, moderator, and panelist at a number of conferences and symposia, and conferences throughout the country, presenting on ERISA and employee benefit-related topics sponsored by a myriad of organizations, including the American Bar Association, the Insurance Law Center at the University of Connecticut Law School, and others.

6. In short, I am familiar with ERISA's and the Code's statutory and regulatory language relating to employee benefit plans, their relevant legislative history and intent, as well as the treatment of the statutes by the executive, legislative, and judicial branches of government. I am also familiar with standards of legal practice concerning the analysis of controlled group liability under ERISA and the Code, and concerning advising in connection with corporate acquisitions and dispositions.

II. DOCUMENTS REVIEWED IN PREPARATION OF EXPERT OPINION

In forming my opinions in this case, I have reviewed copies of the following relevant documents:

1. Closing Book for Purchase of Stock of LSI Corporation of America, Inc. by LSI of America Holdings LLC: Closing Date: June 18, 2013
2. Confidential Memorandum: LSI Corporation of America, Presented by Bayview Capital

2

000147758\0001\465117-v5

   Group
3. LSI of America Holdings LLC Operating Agreement
4. E-mail from Jeffrey Weiss to Darren Chaffee and Neal Cohen dated 4/4/13, subject "RE: CoBe Capital"
5. Email from Darren Chaffee to Jeffrey Weiss (cc to Lee Kellert and Neal Cohen) on 5/21/2013, subject "RE: Cobe/LSI"
6. Email from Darren Chaffee to Jeffrey Weiss, Lee Kellert, and Neal Cohen on 5/28/13, subject "FW: regarding collective bargaining agreement and control group risk"
7. Certificate of formation for Luz Place, LLC
8. Certificate of formation for Sendori Acquisition, LLC
9. Purchase agreement between Sendori Acquisition, LLC; Luz Place, LLC; IAC Search & Media, Inc. for the purchase of SSL Assets, LLC
10. Plaintiffs' Complaint and Demand for Jury Trial
11. Defendants' Answer to Complaint
12. Plaintiffs' First Set of Requests for Admission
13. Plaintiffs' First Set of Interrogatories
14. Defendants' Amended Objections and Responses to Plaintiffs' First Request for Admissions
15. Letter dated December 18, 2015, from Jeffrey J. Goulder to Jeffrey M. Weiss, Esq.
16. Deposition of Jeffrey Weiss, October 25, 2016, with all Exhibits
17. Deposition of Lee Kellert, October 25, 2016, with all Exhibits
18. Deposition of Deborah Baughman, October 25, 2016, with all Exhibits

III. INTRODUCTION

1. I have been retained in this matter to offer my expert opinion on the standard of care for legal practice in advising a client regarding potential liability that can be triggered under the controlled-group liability provisions of ERISA, by reason of a business acquisition.
2. More specifically, I have been retained in this matter to offer my expert opinion on the adequacy of the legal advice provided by the law firm of Jaffe, Raitt, Heuer & Weiss ("Jaffe Raitt") to its clients Neal Cohen, Darren Chaffee, and SSL Assets, LLC ("SSL") concerning the possibility that the acquisition (the "Acquisition") by LSI of America

3

Holdings LLC ("Holdings LLC") of all of the stock of LSI Corporation of America, Inc. ("LSI") could trigger liability of other companies directly or indirectly owned or controlled by Messrs. Cohen and/or Chaffee for LSI's potential multiemployer pension plan withdrawal liability, under the controlled-group liability provisions of Title IV of ERISA.

IV.  THE JAFFE RAITT FIRM DID NOT MEET THE STANDARD OF CARE FOR LEGAL PRACTICE IN ITS ADVICE TO NEAL COHEN, DARREN CHAFFEE HOLDINGS LLC, AND SSL CONCERNING THE RISK OF CONTROLLED GROUP LIABILITY ASSOCIATED WITH THE ACQUISITION OF LSI.

> A.  AN ATTORNEY ADHERING TO THE APPROPRIATE STANDARD OF PRACTICE WOULD HAVE IDENTIFIED JAFFE RAITT'S CLIENTS, FOR PURPOSES OF ADVICE INVOLVING POTENTIAL ERISA LIABILITY, AS INCLUDING NEAL COHEN, DARREN CHAFFEE, HOLDINGS LLC AND SSL.

1. Based on the documents I have reviewed, it appears that Jaffe Raitt did not carefully identify its client at the time of the Acquisition. The only extant engagement letter involving Jaffe Raitt and Messrs. Cohen and Chaffee is an unsigned letter dated February 27, 2013, written to be between Jaffe Raitt and Neal Cohen but concerning only an unrelated acquisition for assets of Nexteer Automotive Corp. and Steeringmex, S. de R.L. de C.V. that never closed. This letter recites that the firm's representation was undertaken only on behalf of CoBe Capital, a company that was affiliated with Messrs. Cohen and Chaffee. CoBe Capital was not itself a party to the Acquisition, and accordingly this letter does not appear directly relevant to the question of who Jaffe Raitt's client was in connection with the Acquisition.

2. Based on the documents I have reviewed, it seems clear that Messrs. Cohen and Chaffee were, as individual investors, seeking guidance on their own behalf and on behalf of their companies in connection with the Acquisition, and it also appears that should have been, and was, clear to Jaffe Raitt.

3. Based on the documents I have reviewed, Mr. Cohen, acting apparently on behalf of himself and Mr. Chaffee, pointed out to Jaffe Raitt that the target of the acquisition faced potential "withdrawal liability" under ERISA, and specifically sought advice from Jaffe Raitt in making sure that the Acquisition would not result in controlled-group joint exposure to that potential withdrawal liability, in the case of entities already owned by

the acquirors.

4. The fact that this question was asked of and answered by Jaffe Raitt should in my view have established to an attorney providing ERISA advice, in connection with a possible transaction, that Messrs Cohen and Chaffee as the acquirors, as well as SSL, were at least among the clients with whom Jaffe Raitt had established an attorney-client relationship with respect to that advice.

5. I have assumed for purposes of the remainder of this report that Messrs. Cohen and Chaffee, and SSL, were clients of Jaffe Raitt in connection with the Acquisition.

        B.    THE POSSIBILITY OF EXPOSURE TO CONTROLLED GROUP LIABILITY IS A SIGNIFICANT KNOWN POTENTIAL ISSUE FOR ANY ACQUIROR OF A BUSINESS, TO WHICH EMPLOYEE BENEFITS ACQUISITION COUNSEL MUST BE ALERT.

1. Potential controlled group liability under Title IV of ERISA is a well-known and well-recognized issue for lawyers in conducting due diligence and advising an acquiror in connection with a potential transaction. See, e.g., Richard D. Nix and Timothy Verrall, "Employee Benefit Issues in Mergers and Acquisitions," 25 Okla. City. U.L. Rev. 435, 437-439 (2000); Mark Bodron, "Defined Benefit Plan Risks and Transitions," in Employee Benefits in Mergers and Acquisitions (materials from 25th Annual Employee Benefits in Mergers and Acquisitions National Institute, American Bar Association Joint Committee on Employee Benefits, June 5, 2014).

2. In this case the documents I have reviewed indicate that the issue of potential controlled group liability should have had even greater prominence for attorneys representing the acquirors, as the clients themselves had specifically highlighted it. Based on the documents I have reviewed, Messrs. Cohen and Chaffee had been, from the inception of the engagement, particularly concerned about the possibility of incurring controlled-group ERISA liability personally or for the companies in which they were already invested. The question appears to have been in fact the first issue raised during consultations with Jaffe Raitt.

C.  CONTROLLED GROUP LIABILITY UNDER TITLE IV OF ERISA DEPENDS UPON A COMPLICATED SET OF TESTS INVOLVING VARIOUS TYPES OF DIRECT, INDIRECT AND ATTRIBUTED OWNERSHIP UNDER VARIOUS SETS OF FEDERAL REGULATIONS.

1. The route to determining controlled group liability for potential withdrawal liability to a multiemployer pension plan under Title IV of ERISA begins with Sections 4201 and 4001(b)(1) of the statute. It must first be noted that a "multiemployer plan" is a defined benefit pension plan, to which more than one employer contributes pursuant to the terms of one or more collective bargaining agreements. As a defined benefit plan, such a plan is susceptible of having insufficient assets to pay benefits (i.e., being "underfunded"). Section 4201 of ERISA provides that "an employer" that withdraws from such a plan is liable for "withdrawal liability" – intended to make up that employer's share of underfunding – under certain circumstances. Meanwhile, Section 4001(b)(1) provides that all trades or business "which are under common control" shall be treated "as a single employer." Taking these two sections together, when any company or business incurs withdrawal liability under ERISA by withdrawing from a multiemployer pension plan, all the companies with which it is under "common control" simultaneously do as well.

2. Based on the documents I have reviewed, at the time of the Acquisition, LSI contributed to a multiemployer pension plan, the Carpenter Labor-Management Pension Plan, and thus faced the possibility of incurring withdrawal liability under ERISA if it ceased to contribute to the plan.

3. The Pension Benefit Guaranty Corporation, or "PBGC," which has regulatory authority under ERISA Title IV, has promulgated a regulation by which two or more trades or businesses will be treated as under "common control" if they are so treated under regulations previously issued by the U.S. Treasury Department under Section 414(c) of the Internal Revenue Code.

4. Accordingly, controlled group status for withdrawal liability purposes reduces to the question of whether the tests in the latter regulation, Treas. Reg. §1.414(c), are met. This regulation was originally promulgated not for purposes of ERISA but for tax-regulatory reasons, including application of the Code's nondiscrimination rules for tax-favored employee benefit plans. It contains a set of complicated and detailed rules for making

such determinations.

5. Treas. Reg. §1.414(c) sets forth two principal alternative tests:
    a. Under the first test, referred to as the "parent-subsidiary group" test, companies are under common ownership if, effectively, a single "parent" company can be identified along with one or more subsidiary companies in which at least an 80% controlling interest is owned, directly or indirectly, by the Parent or other members of the group. The parent and all subsidiaries falling within this 80% chain of ownership are treated as a single employer for purposes of the above-referenced provisions of the Code and ERISA, including the controlled group liability provisions of ERISA Title IV.
    b. The second test, the "brother sister group" test, is more complex. Under this test two entities are generally treated as under common ownership if five or fewer individuals or trusts can be identified who own both: (i) at least an 80% controlling interest in all such entities (the "controlling interest" test); and (ii) more than 50% or more of the stock voting power (in the case of a corporation) in all such entities, taking into account only "identical ownership" (the "effective control" test). Identical ownership, for this purpose, counts an owner's ownership, across a group of companies, in each company only to the extent of the owner's least ownership of any of them. (For example, if one individual owns respectively 10%, 20% and 30% of three companies, the individual's identical ownership of all three is 10%.)
6. These two tests are of equal legal importance; either can result in joint and several liability under Title IV of ERISA. Upon an acquisition, controlled group liability will extend to all the trades and businesses of the acquirer/s if either test is met.
7. The above summary has been highly simplified, for purposes of conveying the essence of the relevant tests. Detailed, specific provisions apply under the regulations for determining what counts, for example, as "ownership" or "control" in the various cases of a stock corporation, a partnership, or an unincorporated business. In addition, an entire section of the regulations, §1.414(c)-3, is devoted to describing circumstances in which various cross-ownerships and other interests are to be excluded in calculating ownership levels for purposes of the regulation's numerical tests.

8. Crucially, in applying either the parent-subsidiary or the brother-sister test, ownership must be "attributed" from certain entities and persons to others. These rules are set forth in §1.414(c)-4 of the regulations. For example, any ownership interest held by a partnership is deemed to be proportionately owned by each of the partnership's greater-than-5% partners; and a similar rule applies to attribution of ownership from corporations to its own shareholders. Attribution of ownership rules also apply with respect to stock that is owned by trusts, estates and family members of an individual in question. Accordingly it is never enough, in applying the "common control" test, to know what ownership interests are owned directly by the persons in question; full information must be obtained about the possibility of attributed ownership from any other potentially relevant source under the regulations.

9. Because of these detailed, intricate ownership tests, the most common approach to gaining a confident understanding of the extent of controlled group status is to obtain or create, with the client's input, an organizational ownership chart, and to trace various types and levels of ownership across all entities with reference to the various tests and requirements in the regulations.

    D.    ONCE IT ARISES, CONTROLLED GROUP LIABILITY UNDER TITLE IV OF ERISA CANNOT BE ESCAPED THROUGH CORPORATE DIVESTITURE OR REORGANIZATION.

1. One of the reasons controlled group status for ERISA purposes is considered by practitioners to be such a serious matter is that such status cannot effectively be deliberately escaped, once it has arisen.

2. ERISA Section 4212(c) provides if "a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject" for withdrawal liability, then effectively the transaction will be disregarded for determining controlled group liability. Courts have emphasized that "[t]he statutory criterion is not whether the transaction is a sham …. It is whether the avoidance of withdrawal liability … is *one* of the principal purposes of the transaction." Santa Fe Pacific Corp. v. Central States, Southeast & Southwest Areas Pension Fund, 22 F.3d 725, 729-730 (7th Cir. 1994) (emphasis added), *rehearing en banc den.*, 1994 U.S. App. LEXIS 14476 (7th Cir. 1994), *cert. den.*, 513 U.S. 987 (1994).

3. It is well-understood among the ERISA bar, as well as by the PBGC and officials of multiemployer plans themselves, that in light of this (and the similar provision in Section 4069 of ERISA for single-employer plans) a business may not plan a transaction with a view to changing its organizational structure so as to divest itself or one of its controlled-group members of liability under ERISA Title IV. If such divestment of liability is a significant consideration in proceeding with a transaction, the transaction will be disregarded for ERISA purposes. Accordingly it is essential, in evaluating and managing exposure under ERISA Title IV, to make sure that controlled group liability never attaches in the first place.

      E. THE JAFFE RAITT FIRM DID NOT ADEQUATELY OR CORRECTLY ANALYZE THE POTENTIAL FOR CONTROLLED GROUP LIABILITY ARISING FROM THE ACQUISITION.

1. Analyzing and managing exposure to controlled group risk under ERISA has long been important for acquirors of businesses, and this concern has been particularly prominent among financial acquirers who maintain a "portfolio" of companies held primarily for investment purposes, such as venture capital, private equity or similar organizations. The general significance of controlled group liability for investors can be seen, for example, from the widespread, high-profile coverage, for instance, of relevant precedents such as *Sun Capital Partners III LP v. New England Teamsters & Trucking Industry Pension Fund*, No. 10-10921-DPW, 2016 WL 1239918 (D. Mass. 2016). See, for example, "Sun Capital Decision Holds Private Equity Funds Liable for Pension Liabilities of Portfolio Company Under Deemed Partnership Theory," Davis Polk & Wardwell Client Memorandum, available at https://www.davispolk.com/publications/sun-capital-decision-holds-private-equity-funds-liable-pension-liabilities-portfolio/ (April 25, 2016); "*Sun Capital:* Private Equity Funds Liable for Portfolio Company's Withdrawal Liability," Latham & Watkins Client Alert, available at https://www.lw.com/thoughtLeadership/LW-sun-capital-private-equity-withdrawl-liability (April 4, 2016).

2. Based on the documents I have reviewed, the various investment activities and entities in which Messrs. Cohen and Chaffee appear to have been involved evidently fell into this general category of "portfolio" investors.

9

3. The brother-sister test, in particular, is of especial concern for such portfolio acquirers who are engaged in repeated acquisitions. This is because the brother-sister test can be triggered unexpectedly, due to a small group of individuals or investors owning individually smaller percentages of stock, across companies that are functionally separate.

4. Analysis of the ownership structure of Messrs. Cohen and Chaffee's existing investments, together with the proposed ownership of LSI Holdings, should have led to the immediate conclusion that at least one of these holdings would be brought within common control with LSI, and thus subjected to joint and several withdrawal liability.

5. Based on the documents I have reviewed, at the time of the Acquisition Mr. Cohen owned – by attribution through a 100%-owned limited liability company – 95% of the profits and capital interests in SSL. Meanwhile Mr. Chaffee owned – also by attribution, also through a 100%-owned limited liability company – the remaining 5% of the profits and capital interests in SSL.

6. Information about indirect ownership of interests held by Messrs. Cohen and Chaffee would have had to be elicited from these individuals by Jaffe Raitt, in order correctly to characterize the risk of triggering potential controlled-group liability on the part of SSL as a result of the Acquisition

7. Taking the above indirect ownership interests into account, five or fewer individuals (namely, Messrs. Cohen and Chaffee) would, immediately after the Acquisition, own greater than an effective 80% ownership interest in both LSI and SSL (the "controlling interest" prong of the brother-sister group test) and greater than an effective 50% ownership interest in both, taking into account only Mr. Cohen's 49% "identical ownership" and Mr. Chaffee's 5% "identical ownership" in the two companies (the "effective control" prong of the brother-sister group test). Thus, proceeding with the Acquisition would have the immediate result of making SSL jointly liable for any withdrawal liability incurred by LSI. There does not appear to be uncertainty about this conclusion, or potential argument to the contrary.

10

F. JAFFE RAITT'S FAILURE AFFIRMATIVELY TO ELICIT SUFFICIENT INFORMATION TO APPLY THE BROTHER-SISTER CONTROLLED GROUP TEST DEPARTED FROM THE STANDARD OF CARE EXPECTED OF AN ATTORNEY ENGAGED TO ADVISE AS TO SUCH A MATTER.

1. Based on the documents and testimony I have reviewed, Jaffe Raitt attorneys, at most, inquired in an early telephone conversation whether there was any "common ownership" of other companies, between Messrs. Cohen and Chaffee. Jaffe Raitt has stated in the documents and testimony I have reviewed that this question was asked and that Mr. Cohen answered in the negative.

2. If no such question was asked, then Jaffe Raitt assuredly fell short of the standard of care. As noted above, there is simply no way to have applied the brother-sister test without information about all other business in which Messrs. Cohen and Chaffee had ownership.

3. Assuming the above question was in fact asked of and answered by Mr. Cohen: It is true that if no other entity existed in which both Messrs. Cohen and Chaffee had at least some joint, "common ownership" – taking into account all attributed ownership, and the exclusion and other principles set forth in the Treasury regulations – then keeping each of them under 50% ownership of Holdings would, logically, have ruled out the existence of a brother-sister group. That, however, raises the question whether it met the standard of practice in such a context simply to have asked, of a client, "Do you have any common ownership of another entity?"

4. In my opinion, based on my experience, "common ownership" is such a technical term in these circumstances that having simply asked the question this way of a lay client is not adequate. It is nearly tantamount to having asked of the client: "Will this transaction create a controlled group under ERISA?" It is part of the very question that the client has, in fact, retained the attorney to help answer. To answer the question of common ownership correctly under ERISA requires that the answerer already have knowledge of the elaborate attribution rules for determining ownership – and I note that "ownership" itself is broken down in the regulations into the different categories of control and economic ownership

5. As noted above, the potential pitfalls implicated by this issue under ERISA would have

11

    been high on the list of concerns for an employee benefits attorney advising as to any potential acquisition; this is even more true the case where this was the major question principally, and initially, inquired about by the client. Under such circumstances a very thorough, direct set of questions and requests for detailed ownership information was called for.

6. Based on the documents and testimony I have reviewed and my experience with corporate acquisitions, Jaffe Raitt did not meet the standard of professional practice in not asking specific follow-up questions necessary to confirm the existence of common ownership, in the specialized sense applicable under ERISA, so as to be able to reach definitive conclusions about the application of the brother-sister test for a client worried about that specific issue and which was known to maintain a portfolio of other entities held for investment.

7. In such circumstances, the standard of practice required at minimum that the attorney explain to the client the existence of (and also to summarize the general outlines of) the ownership attribution rules under the regulations. In my experience, the norm would be actually to create, working with the client, a detailed organizational chart, so as to rule out the possibility of any misunderstanding or overlooked ownership connection that might be relevant to the analysis.

8. In any case, simply asking of a lay client: "Do you have any other common ownership?" would not suffice, given the subtleties implicit in the question from a legal standpoint.

## V.    Conclusion (Summary)

1. In all, then, by not following up in any way with their clients about their concern about potential controlled group liability; by at most having simply asked, without further explanation of the term, whether Messrs. Cohen and Chaffee shared "common ownership" of any other entity – without describing the detailed attributed-ownership and other analysis that would have to be applied in addressing that issue; and in general by not seeking additional, more detailed information about the various investments in the respective clients' portfolios, preferably to have included a detailed organizational chart, Jaffe Raitt did not meet the standard of care for ERISA advice to potential acquirors of a company facing withdrawal liability under Title IV of ERISA. This is more emphatically

12

the case where, as here, the clients had specifically raised their potential concern about incurring controlled group exposure to this liability, with respect to their other, existing investments.

2. Amendments or additions to this Report and accompanying appendices may be required as a result of developments prior to or at trial, including but not limited to, the discovery of new evidence, expert discovery, and testimony of any other witness in deposition or at trial.
3. I am being compensated by Plaintiffs at the rate of $400 per hour for my study, testimony and report in this case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 9th day of December, 2016, at Ann Arbor, Michigan.

_____
Andrew W. Stumpff

# EXHIBIT A

## ANDREW W. STUMPFF

**Work Address:**

Butzel Long                                Phone: (734) 213-3608
301 E. Liberty, Suite 500                  Email: stumpff@butzel.com
Ann Arbor, Michigan 48104

## **EMPLOYMENT**

| | |
|---|---|
| **2015 - present** | Of Counsel, Butzel Long, Ann Arbor, Michigan |
| **2008 - present** | Lecturer, University of Michigan Law School (<u>Course</u>: Employee Benefits and Executive Compensation Law) |
| **2010 - present** | Adjunct Professor, University of Alabama Law School LL.M in Taxation Program (<u>Course</u>: Employee Benefits and Executive Compensation Law) |
| **2008 - 2015** | Associate and Shareholder, Stevenson Keppelman Associates, Ann Arbor, Michigan |
| **2007** | Sole practitioner specializing in employee benefits and executive compensation law, East Lansing, Michigan |
| **2004 - 2007** | Graduate Studies in computational biochemistry, Michigan State University |
| **1986 - 2003** (except as below) | Associate, Partner, and Counsel, Davis Polk & Wardwell, New York, New York |
| **1991 - 1995** | Attorney and Assistant Branch Chief, Internal Revenue Service Office of Chief Counsel, Washington, D.C. |
| **1989 - 1991** | Associate, Spencer Fane Britt & Browne, Kansas City, Missouri |

14

**EDUCATION**

**UNIVERSITY OF MICHIGAN LAW SCHOOL,** Ann Arbor, Michigan
J.D. 1986, *cum laude*
Article Editor, *Michigan Law Review*

**WASHINGTON UNIVERSITY,** St. Louis, Missouri
A.B. 1983, *with honors* in Mathematics

**LICENSED:** New York (1987), Missouri (1989), Michigan (2002)

**PROFESSIONAL HONORS:**

Elected Fellow, American Council of Employee Benefits Counsel (2010)

Former Co-Chair, Employee Benefits Committee of Tax Section of New York State Bar Association

**CASES IN WHICH SERVED AS EXPERT DURING LAST FOUR YEARS:**

Moyle v. Liberty Mutual Retirement Benefit Plan, 3:10-CV-02179 (S.D. Cal.)

**ALL PUBLICATIONS DURING LAST TEN YEARS:**

**BOOKS, CHAPTERS, AND TREATISES**

Casebook: Executive Compensation (Foundation Press, 2016)

(Coauthor with John Langbein, David Pratt, and Susan Stabile) Casebook: Pension and Employee Benefit Law (Foundation Press, 6th ed. 2015)

Casebook: Employee Benefits and Executive Compensation (Foundation Press, 2011)

Tax Management Portfolio, 395-3rd T.M., VEBAs and Other Welfare Benefit Funding Arrangements (BNA, 2011)

**LAW REVIEW ARTICLES**

"Law is the Command of the Sovereign: H.L.A. Hart Reconsidered," 29 Ratio Juris 364 (2016)

"Case Law, Systematic Law, and a Very Modest Suggestion," 35 Statute L. Rev. 159 (2014)

"The Law is a Fractal: The Attempt to Anticipate Everything," 44 Loyola University Chicago L.J. 649 (2013)

"Darkness at Noon: Judicial Interpretation May Have Made Things Worse for Benefit Plan Participants under ERISA than had the Statute Never Been Enacted," 23 St. Thomas L. Rev. 221 (2011)

"The 'Big Three' VEBAs and other Stand-Alone Welfare Benefit Trusts: What Is and Is Not Novel About Them," BNA Tax and Accounting Insights and Commentary (BNA, December 8, 2009)

(With Norman Stein): "Shelf Project: Elimination of Tax Incentives for ESOPs," (Tax Notes, Oct. 19, 2009)

"Fifty Years of Utopia: The Weird History of the Employee Stock Ownership Plan," 62 Tax Lawyer 419 (Georgetown University Law School, 2009)

"Deferred Compensation and the Tax Policy Limitations of the Nuclear Option" (Tax Notes, November 5, 2007)

## SELECTED CONFERENCES, WORKSHOPS, SYMPOSIA, AND SEMINARS

Moderator, Fifth Annual National Benefits and Social Insurance Conference, University of Connecticut Law School (Hartford, Connecticut, April 15, 2016)

One of 16 invited participants in conference "Not Just the Bottom Line: New Strategies for Inclusive Prosperity," concerning employee stock ownership, hosted by U.S. Secretary of Labor Thomas Perez at White House Executive Office Building (Washington, DC, March 18, 2015)

"Proposal for a Non-Subsidized, Non-Retirement- Plan, Employee-Owned Investment Vehicle to Replace the ESOP," Third Annual ERISA, Employee Benefits, and Social Insurance National Conference, hosted by Marquette Law School (with Sean Anderson) (Milwaukee, Wisconsin, March 28, 2014)

Co-organizer and presenter, Second Annual National ERISA Conference, "Regulation of Benefit Plans: The Most Consequential Subject to Which No One Pays Enough Attention." University of Michigan (Ann Arbor, Michigan, March 22, 2013)

"Understanding Fees & Expenses – The Legal Framework," Fiduciary Awareness Seminar Series (Detroit, November 1, 2011)

"Will Health Reformers' Goals be Realized?  Implications of ERISA's Checkered Judicial History," Practicing Law Institute Conference on ERISA Litigation (with Kathryn Kennedy and Brendan Maher) (New York, September 15, 2010)

"Funding Post-Retirement Health Insurance Benefit Liabilities Through a Section 115 Trust," Michigan Association of Public Employee Retirement Systems 2010 Spring Conference (with Beth Bialy) (Mt. Pleasant, Michigan, May 24, 2010)

"ERISA Litigation – An Academic Perspective," Practicing Law Institute Conference on ERISA Litigation (with Brendan Maher) (New York, September 30, 2009)

"Big Three VEBAs: Background and Context," Michigan State Medical Society Conference on Automotive Industry and Health Care (with Robert Stevenson) (Novi, Michigan, September 17, 2009)

"Practical Lessons from Employee Benefits Litigation," State Bar of Michigan Taxation Section Annual 2009 Tax Conference (panel discussion) (Plymouth, Michigan, April 29, 2009)

"Practical Lessons from Employee Benefits Litigation," American Bar Association Section of Taxation Midyear 2009 Meeting (panel discussion) (New Orleans, January 10, 2009)

ERISA commentator quoted in Chicago Tribune, USA Today, Detroit Free Press, Detroit News, and other media.