# EXHIBIT B

ANDREW W. STUMPFF
COHEN vs JAFFE

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF MICHIGAN
 3
   NEAL COHEN, DARREN CHAFFEE,      )
 4 and SSL ASSETS, LLC,             )
                                    )
 5        Plaintiffs,               )
                                    ) Case No. 16-11484
 6     vs.                          )
                                    )
 7 JAFFE, RAITT, HEUER & WEISS, P.C.,)  Honorable
   JEFFREY M. WEISS, LEE B. KELLERT )  George C. Steeh
 8 and DEBORAH L. BAUGHMAN,         )
                                    )  Magistrate Judge
 9        Defendants,               )  Anthony P. Patti
                                    )
10 JAFFE, RAITT, HEUER & WEISS, P.C. )
11        Third Party Plaintiff,    )
12     vs.                          )
13 COBE CAPITAL, LLC,               )
                                    )
14        Third Party Defendant.    )
15 _____
16       THE DEPOSITION OF ANDREW W. STUMPFF
17
18 DEPONENT:    Andrew W. Stumpff
19 DATE:        Thursday, February 9, 2017
20 TIME:        8:02 a.m.
21 LOCATION:    Plunkett Cooney
                150 West Jefferson, Suite 800
22              Detroit, Michigan  48226
23 REPORTER:    Kelli A. Murphy, CSR-7768, B.S.
24
25
```

**Page 2**

```
 1 APPEARANCES:
 2
 3     JEFFREY J. GOULDER, ESQ.  (AZ010258)
       Stinson Leonard Street LLP
 4     1850 North Central Avenue, Suite 2100
       Phoenix, Arizona 85004-4584
 5     602.279.1600
       jeffrey.goulder@stinson.com
 6
           Appearing on behalf of Plaintiffs.
 7
 8
       JEFFREY S. HENGEVELD, ESQ. (P66029)
 9     Plunkett Cooney
       38505 Woodward Avenue, Suite 2000
10     Bloomfield Hills, Michigan  48304
       248.594.8202
11     jhengeveld@plunkettcooney.com
12         Appearing on behalf of Defendants.
13
14
15
16          *   *   *
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        T A B L E  O F  C O N T E N T S
 2
 3 WITNESS
 4 Andrew W. Stumpff
 5
   EXAMINATION
 6
   By Mr. Hengeveld.....................Page 5
 7
 8
 9            *   *   *
```

**Page 4**

```
 1        E X H I B I T S
 2
 3 STUMPFF
   Deposition                              Page
 4 Exhibit       Description              Marked
   ===================================================
 5
   Exhibit 55  07/05/16 Letter/Attachment    9
 6              (P0037273-37279)
 7
   Exhibit 56    Multi-Page Document         17
 8
 9 Exhibit 57    Expert Report of            80
                 Jordan Schreier
10
13            *   *   *
```



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
5–8

Page 5

1              Detroit, Michigan
2              Thursday, February 9, 2017
3              About 8:02 a.m.
4
5                    *   *   *   *
6         THE REPORTER:  Raise your right hand, please.
7         MR. STUMPFF:  (Witness complies.)
8         THE REPORTER:  Do you swear or affirm the
9    testimony you're about to give is the truth, the whole
10   truth, and nothing but the truth?
11        MR. STUMPFF:  I do.
12        THE REPORTER:  Thank you.
13             EXAMINATION
14  BY MR. HENGEVELD:
15  Q   Can you please state your full name?
16  A   Sure.  Andrew Wayne Stumpff.
17  Q   Mr. Stumpff, my name is Jeff Hengeveld, and I represent
18      the defendants in this case.  Have you given a
19      deposition before?
20  A   Yes, I have.
21  Q   How many times have you been deposed?
22  A   Just once.
23  Q   Okay.  In what case was that deposition given?
24  A   The -- I can't remember the full name of the case, but
25      it was a case in which I was an expert, and the

Page 6

1       defendant's party's name was Liberty Insurance.
2   Q   Okay.  And that's the Moyle versus --
3   A   Yes.
4   Q   -- Liberty case?
5   A   Yes.
6   Q   When did you give that deposition?
7   A   I'm going to guess four years ago, roughly.
8   Q   And that case is currently pending?
9   A   No.  It was decided on summary judgment, again, probably
10      three or four years ago.
11  Q   Okay.  Was that the only case in which you've previously
12      served as an expert?
13  A   Yes.  I've been consulted as a potential expert in other
14      cases, but that's the only case I think that I've ever
15      been retained as an expert, actually retained.
16  Q   Can you tell me what that Moyle versus Liberty case was
17      about?
18  A   Yes.  That also involved a merger acquisition context,
19      and I was an expert for the plaintiffs, and the issue
20      had to do with whether past service credit should be
21      granted to employees of the company that was acquired,
22      and the acquiror's plans for service prior to the
23      acquisition.
24          And it was a question of the drafting of the
25      transaction document, which, I believe, was a stock

Page 7

1       purchase agreement.
2   Q   All right.  Did that have anything to do with controlled
3       group liability?
4   A   No.  It didn't have anything to do with controlled group
5       liability.  There's a tangential relation between the
6       ideas of controlled group liability, and what was at
7       issue there, because, as I recall, this question went to
8       past service, and -- under the definition of a plan --
9       it was serviced with your, quote, employer.
10          And part of the issue was around ambiguity and
11      vagueness around the definition of "employer," and that,
12      I think, included a controlled group concept, at the
13      time, but it wasn't really central to the case.
14  Q   What specific issue were you retained to give opinions
15      about in that case?
16  A   Whether the language in the transaction agreement
17      required that the employees -- who became employees of
18      the acquiror -- were entitled to receive past service
19      credit for the acquiror's pension plan for their service
20      prior to the acquisition.
21  Q   Were you engaged to critique the drafting of that
22      language by -- sorry, strike that.
23          Were you engaged to critique the attorney's
24      drafting of that language, or were you engaged to opine
25      on the language, itself?

Page 8

1   A   Um, I think that there was an element of both, as I
2       recall.  You'll have to forgive me.  I, perhaps, should
3       have reviewed that.
4           But my recollection is that there were
5       elements of both, and that part of the issue was that
6       there was a, sort of, a typical standard for drafting
7       provisions relating to providing service, and this
8       departed from that.
9           And that, based on that departure, the
10      language should be read to provide past service.  That's
11      my best recollection of what it was.
12  Q   There were no claims against a lawyer --
13  A   No.
14  Q   -- in that case?
15          Aside from sitting for a deposition in that
16      case, did you have any other involvement?
17  A   Sitting for a deposition, and then, I think, at some
18      point, I, sort of, discussed the case with the lawyers,
19      and that's it.  There was nothing further.  I did not do
20      a report.  The case did not go to trial.
21  Q   Again, the case was dismissed by summary disposition --
22  A   Yes.
23  Q   -- to the best of your recollection?
24  A   Yes.
25  Q   Did you say that you have served in some consulting role



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
9–12

Page 9

1   as an expert?
2  A   No. What I meant to say is I was consulted about the
3      possibility of being an expert several other times, but
4      I never -- other than that case -- proceeded to be
5      retained as an expert.
6  Q   Okay. When were you first retained by the Stinson law
7      firm, in this case?
8  A   Well, to the best of my recollection, it was late spring
9      of last year, or, perhaps, early summer. I'd say
10     sometime between April and June, but that's just to the
11     best of my recollection.
12         MR. HENGEVELD: I'm handing you what I've
13     marked as Exhibit No. 55.
14         (Marked for identification:
15          Deposition Exhibit No. 55.)
16         THE WITNESS: Sure. (Witness reviewing
17     document.)
18 BY MR. HENGEVELD:
19 Q   Exhibit 55 is a series of documents that include -- on
20     the first two pages -- a letter to you, from
21     Jeff Goulder, on July 5, 2016.
22 A   Um-hmm.
23 Q   It looks like it's an engagement letter.
24         Is that what it looks like to you?
25 A   Yes, it does.

Page 10

1  Q   Were you contacted by either Jeff Goulder, or another
2      member of the Stinson law firm, prior to July of 2016?
3  A   Yes. This would have been after several conversations,
4      conflict checks, and so forth.
5  Q   And so you think you were first contacted in early
6      spring of 2016?
7  A   No, not -- not early spring. As I said, sometime
8      between probably April and June, to the best of my
9      recollection. If I check my records, I could give you a
10     better sense, but that's my best recollection.
11 Q   And what records would you have to check to determine
12     that?
13 A   E-mails, internal e-mails.
14 Q   Did you know Jeff Goulder before --
15 A   No.
16 Q   -- he reached out to retain you?
17 A   No.
18 Q   Did you know anyone at the Stinson law firm, prior to
19     being retained, in this case, as an expert?
20 A   I did. I know one of their former partners fairly well,
21     a man named Tom Brous. I knew him for many years.
22 Q   Did Tom Brous reach out to you, at all, regarding this
23     case?
24 A   No. I'm not entirely certain how Stinson came to us.
25     My recollection is that Stinson first contacted -- I

Page 11

1      think Stinson got a recommendation of our firm,
2      generally -- and possibly including my name, but
3      possibly including other names -- from a lawyer in
4      Kansas City, and then, ultimately, sort of, narrowed in
5      on me.
6         MR. GOULDER: Let's go off the record for just
7      one second.
8         MR. HENGEVELD: Okay.
9         MR. GOULDER: Let me just step out with
10     Andrew.
11         MR. HENGEVELD: Sure.
12         (Momentarily off the record.)
13 BY MR. HENGEVELD:
14 Q   How many telephone conversations did you have with
15     Jeff Goulder, or anyone else from the Stinson law firm,
16     prior to July of 2016?
17 A   I'm going to guess two.
18 Q   Do you know how long those telephone conversations
19     lasted?
20 A   About 15 to 30 minutes. I'm guessing.
21 Q   Each?
22 A   Yeah.
23 Q   Did you agree to serve as an expert after the first
24     telephone conversation?
25 A   I don't remember. My recollection is likely not.

Page 12

1  Q   Okay. Why not?
2  A   After the first conversation, I can't really accept any
3      representation, of any sort, without checking internally
4      for various things.
5  Q   Notably a conflict check?
6  A   Notably, yes.
7  Q   Did you form any conclusions about Jaffe, Raitt's -- or
8      the lawyer at Jaffe, Raitt's actions after that first
9      telephone conversation?
10         MR. GOULDER: At any time after, including
11     through today?
12         THE WITNESS: Um-hmm.
13         MR. HENGEVELD: No. I want to be more narrow.
14 BY MR. HENGEVELD:
15 Q   After the initial telephone discussion with
16     Jeff Goulder, did you form any conclusions about the
17     conduct of the defendants in this case?
18 A   No.
19 Q   What about after the -- immediately after the second
20     conversation with Jeff Goulder, did you form any
21     opinions about the conduct of the defendants in this
22     case?
23 A   No.
24 Q   When did you first form opinions or conclusions about
25     the conduct of the defendants in this case?



800.211.DEPO (3376)
EsquireSolutions.com

ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
13–16

Page 13

1 A I first formed a conclusion after reviewing the
2 documents that were sent to me by Stinson in connection
3 with the case.
4 Q You indicated that you had two telephone conversations
5 with Jeff Goulder prior to July of 2016?
6 A To the best of my recollection.
7 Q To the best of your recollection?
8 A Yes.
9 Q Did you have any conversations with anyone else at the
10 Stinson law firm, regarding this case, prior to July of
11 2016?
12 A I don't believe so.
13 Q Have you ever spoken to any other attorney, regarding
14 this case, at the Stinson --
15 A Yes.
16 Q -- law firm --
17 A Yes.
18 Q -- other than Jeff Goulder?
19 A Yes.
20 Q And who was that?
21 A Michael Vincent and Phil McKnight.
22 Q In total -- so this being including the two
23 conversations prior to July 2016 -- in total, how many
24 conversations did you have with Jeff Goulder regarding
25 this case?

Page 14

1 A I'm sorry. Cumulatively to date?
2 Q Sure.
3 A Perhaps, 12. On that order of magnitude.
4 Q Cumulatively, how many conversations have you had with
5 Michael Vincent regarding this case?
6 A Perhaps 12, a dozen. That's subject to a large margin
7 of error.
8 Q And were those conversations exclusively with
9 Michael Vincent, or are you including conversations
10 where Jeff Goulder might be a part of those
11 conversations?
12 A Okay. So to break it down, these are -- it's all order
13 of magnitude, so probably the numbers are all the same,
14 since they're all the same order of magnitude -- but,
15 let's say, a dozen just with Michael; three or four with
16 both of them; and, perhaps, six with just Jeff.
17 Q And how many conversations did you have with
18 Phil McKnight?
19 A One.
20 Q What was the purpose of that conversation?
21 A To -- I realized -- I was under the understanding that
22 he was also familiar with the facts of this case, and I
23 wanted to get a sense of whether his understanding of
24 the facts, and what had happened, was any different from
25 mine.

Page 15

1 Q And did your conversation with him reveal that he was
2 familiar with the facts, and how that differed?
3 MR. GOULDER: Let me just caution you on that,
4 Andrew. Under the rules, Mr. Hengeveld is entitled to
5 know what facts my firm conveyed to you --
6 THE WITNESS: Um-hmm.
7 MR. GOULDER: -- and what assumptions we asked
8 you to make --
9 THE WITNESS: Um-hmm.
10 MR. GOULDER: -- and what your billing
11 arrangement is with us.
12 THE WITNESS: Right.
13 MR. GOULDER: So, I believe, Mr. Hengeveld's
14 question goes to what facts Mr. McKnight conveyed to
15 you, and that's a fair question, but to the extent you
16 had conversations that went beyond that, please let us
17 know, and don't answer.
18 THE WITNESS: Okay. I think --
19 Well, why don't you repeat your previous
20 question?
21 MR. HENGEVELD: Sure. Can you read that back?
22 THE REPORTER: Yes.
23 (Whereupon the question was read
24 back by the court reporter as follows:
25 QUESTION: And did your conversation with him

Page 16

1 reveal that he was familiar with the facts, and
2 how that differed?)
3 THE WITNESS: My conversation with him did not
4 produce any facts different than what I'd already been
5 provided by Stinson.
6 BY MR. HENGEVELD:
7 Q Okay. Are you relying upon the facts provided by, or
8 discussed with -- strike that.
9 Are you relying upon the facts provided to
10 you, if any, by Mr. McKnight for the opinions that you
11 reached in this case?
12 A No.
13 Q During any of the conversations with Jeff Goulder and
14 Michael Vincent, were you asked to make any assumptions
15 about the facts, in this case, or assumptions, in
16 general, about this case?
17 A No.
18 Q Have you made any assumptions in formulating your
19 opinions in this case?
20 A Only where I expressly say the word "assuming."
21 Q Okay.
22 A Yeah. Only where I expressly say the word "assuming."
23 Q And that's in your expert --
24 A In the --
25 Q -- report --



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
17–20

Page 17

1  A   -- report, yes.
2  Q   -- which we'll look at in a minute?
3  A   Sure.
4       MR. HENGEVELD:  I'm handing you what I've
5  marked as Exhibit 56.
6       (Marked for identification:
7       Deposition Exhibit No. 56.)
8       THE WITNESS:  Thank you.
9       MR. GOULDER:  Thank you.
10 BY MR. HENGEVELD:
11 Q   I guess, what is Exhibit 56?
12 A   My expert report.
13 Q   Okay.  Looking at the first page of Exhibit 56, under
14     the section "Qualifications," in paragraph 1:
15          Does paragraph 1 explain what your current
16     employment is?
17 A   It does, except that the University of Michigan is
18     not -- this year -- offering this course, so I'm not
19     teaching this particular academic year.
20          And, also, the last sentence has changed since
21     I wrote this.  I have now become a nonequity shareholder
22     of Butzel Long, instead of "Of Counsel."
23 Q   Currently, what percentage of your time is spent
24     practicing law versus spent in academia?
25 A   About 50 percent for each.

Page 18

1  Q   For how long has that been true that you've been
2      50 percent practicing and 50 percent in academia?
3  A   About eight years.
4  Q   Of the 50 percent of time you spent actually practicing
5      law, is that practicing exclusively in ERISA law?
6  A   No.  It's ERISA and employee benefits -- or, I'm
7      sorry -- executive compensation.
8          So can I just clarify that?
9  Q   Sure.
10 A   ERISA can be used as a synonym when you're describing
11     practice types as employee benefits.
12          So when answering your question, when you
13     asked if I practice exclusively in ERISA, I'm
14     interpreting that to mean employee benefits, and I'm
15     answering that I spend it practicing employee benefits
16     and executive compensation.
17 Q   Can you briefly summarize, then, what you mean by the
18     differences in the employee benefits side versus the
19     executive compensation side?
20 A   Sure.  Employee benefits tends -- and this is all a
21     matter of how law firms organize themselves in the US --
22     employee benefits tends to refer to more broad-based
23     programs like retirement plans and health insurance
24     plans.
25          Executive compensation tends to refer to

Page 19

1      specific arrangements with senior executives and stock
2      options and employment agreements.
3  Q   Thank you.
4  A   Um-hmm.
5  Q   Going back to Exhibit 56, in paragraph 2, does
6      paragraph 2 give us a, kind of, summary of your practice
7      since you graduated from law school?
8  A   Yes.
9  Q   What was the reason that you took the three-year hiatus
10     from practicing law in 2004 to 2006, during which you
11     studied graduate computational biochemistry?
12 A   That was a combination of a family change.  My wife, at
13     the time, very much wanted to move back to Michigan and
14     I agreed.  It was a combination of that, and being a
15     little burned out from the transactional practice of
16     law, and wanting to try something different.
17 Q   Did you obtain your degree in computational --
18 A   I did not.
19 Q   -- biochemistry?
20 A   I did not.
21 Q   In paragraph 3, the last sentence -- sorry, back to
22     Exhibit 56, so it's clear, for the record -- in
23     paragraph 3, under "Qualifications," the last sentence
24     states:
25          I estimate that during the course of my

Page 20

1      career, I've been professionally involved in
2      approximately 100 completed acquisitions valued at
3      at least $10 million each.
4          Do you see that?
5  A   Yes.
6  Q   How many, if any, of those acquisitions involved clients
7      coming to you to ask to have the acquisitions structured
8      in such a way to avoid controlled group liability?
9  A   This is going to be an estimate -- because one would
10     have to enumerate all of these transactions going back
11     30 years -- but I am going to estimate, perhaps, a third
12     of them, say 30, involved situations where that was an
13     important issue.  I -- let's modify that to say 20 to
14     30.
15 Q   So to be clear, have you had clients come to you with
16     about 20 or 30 acquisitions where they have asked you to
17     structure an acquisition of a company that had a
18     multiemployer pension plan in such a way that the
19     acquiror would not have controlled group liability
20     attached to any of the other entities that the acquiror
21     might also own?
22 A   So I have to clarify two things.  It's just struck me,
23     right now, that you're specifically asking about
24     multiemployer plan liabilities, as opposed to Title IV
25     liability, generally, under ERISA.



Page 21

1    The 20 to 30 relates to Title IV liability,
2  generally, including multiemployer plans, but also
3  single-employer plans. For multiemployer plans, that's
4  less common, so it's probably more like 10. So I want
5  to clarify that.
6  Q   Thank you.
7  A   The second thing, in response to your most recent
8  question, you've asked how many transactions have
9  clients specifically asked that we structure the
10  transaction to avoid controlled group liability.
11  Q   Um-hmm.
12  A   And that's very few in the sense of the client having to
13  put the question that way, as opposed to "Can you tell
14  us whether we will have controlled group liability?"
15    But, I think, if you read your question
16  broadly to include that, then I would say, roughly, 10
17  on the multiemployer side, and 20 to 30 Title IV,
18  altogether.
19  Q   Do the Title IV plans have the same law applicable to it
20  regarding controlled group liability?
21  A   Yes. Multiemployer pension plans are a subset of
22  Title IV.
23  Q   When is the last time that you had a client retain you
24  with regard to an acquisition that involved an issue of
25  avoiding controlled group liability?

Page 22

1  A   Let me think. Four years ago.
2  Q   Have you ever had a client, in which you advised about
3  an acquisition, have a controlled group -- as a result
4  of the acquisition -- that you were unaware of?
5    MR. GOULDER: I'm sorry. Can I get that
6  question back?
7    THE REPORTER: Yes.
8    MR. GOULDER: I didn't follow it.
9    (Whereupon the question was read
10    back by the court reporter as follows:
11    QUESTION: Have you ever had a client, in which
12    you advised about an acquisition, have a
13    controlled group -- as a result of the
14    acquisition -- that you were unaware of?)
15    THE WITNESS: Um --
16  BY MR. HENGEVELD:
17  Q   Do you understand the question?
18  A   Well, I guess, to make sense of it, I have to assume you
19  mean that I was unaware of it until later?
20    Because if I was unaware of it, and I'm still
21  unaware of it, then, obviously, I don't know.
22  Q   Um --
23  A   So you're asking:
24    Did I later find out that a transaction I
25  structured resulted in a controlled group that I had

Page 23

1  been unaware of at the time?
2  Q   That's it. That's -- yeah, that's --
3    MR. GOULDER: Answer that one.
4    THE WITNESS: No.
5  BY MR. HENGEVELD:
6  Q   That's the question that I would like for you to answer.
7  A   Okay. No.
8  Q   Going back to Exhibit No. 56, in Section -- I'm
9  referring you to Section II, "Documents Reviewed in
10  Preparation of Expert Opinion."
11    Are the documents enumerated in that section,
12  in numbers 1 to 18, the only documents that you have
13  looked at in order to form your opinions in this case?
14  A   As of now?
15  Q   Yes.
16  A   No.
17  Q   What other documents, in addition to those listed in
18  Exhibit 56, have you reviewed in order to form your
19  opinions in this case?
20  A   Well -- so you're saying in order to form my opinions.
21    So these are the documents that I had reviewed
22  as of the time I read this report. In order to form the
23  opinion that I -- the updated opinion that I have, as of
24  today, I have reviewed documents since then.
25    I won't be able, from memory, to recite all of

Page 24

1  them, but, for example, they include additional
2  depositions of Mr. Chaffee, Mr. Cohen, and Mr. Schreier.
3    And, I believe, I also did look at the other
4  expert reports filed by the defendant, and all of the
5  exhibits to those.
6  Q   Has a review of those depositions, and the defendants'
7  expert reports, changed your opinions that you've
8  expressed in Exhibit 56 at all?
9  A   No.
10  Q   Did you review just Jordan Schreier's expert report, in
11  this case, or did you review the other two expert
12  reports as well?
13  A   The other two as well.
14  Q   What was your purpose in reviewing those expert reports?
15  A   To see if there was anything that would change my
16  opinion.
17  Q   Is there any document, or other piece of evidence that
18  you've asked for, that you have not been given, in order
19  to form your opinions?
20  A   The only thing I mentioned, that I hadn't received, was
21  our expert report by Mr. Geddes, but that turns out it's
22  not related to -- my understanding is it does not relate
23  to anything in my report, or my opinion.
24  Q   What was the reason you were asking for Mr. Geddes'
25  report?



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
25–28

Page 25

1 A  Completeness.
2 Q  Did you review, or ask for, the report from the other
3     damage expert in -- on behalf of plaintiffs?
4 A  No.
5 Q  Do you know who Jordan Schreier is?
6 A  I've met him once.
7 Q  Where was that meeting?
8 A  That was in a meeting at a restaurant in Ann Arbor.
9 Q  What was the purpose of that?
10 A  The purpose of the meeting was the law firm I was
11     previously a part of was -- at that point, we'd been
12     approached by Butzel, and by other firms about a merger,
13     and we were talking to other firms to see whether -- if
14     other people were also interested before we made a
15     decision.
16        So we were talking with Mr. Schreier about
17     whether Dickinson Wright would be interested in working
18     with our firm.
19 Q  Do you have an opinion as to whether Jordan Schreier is
20     a qualified ERISA, or standard of care expert?
21 A  I have no basis to know.
22 Q  Do you know Jeff Weiss?
23 A  I do not.
24 Q  Do you know Deb Baughman?
25 A  I have met her at least twice, yeah.

Page 26

1 Q  What was -- what were those meetings, and what were the
2     occasion for those meetings?
3 A  So in Deb's case, I have met her once, or possibly
4     twice, at Bar Association functions. And then one of
5     the other meetings was exactly the same circumstances as
6     the meeting in which I met Mr. Schreier, but involving
7     Jaffe.
8 Q  That is, you were considering taking your practice to
9     the Jaffe law firm?
10 A  That's correct.
11 Q  How long ago was that?
12 A  This was -- this is 2017. I am going to guess
13     two years -- roughly, two years ago.
14 Q  Was there a particular reason that you decided to go
15     with the Butzel law firm versus the Jaffe law firm?
16 A  There were a number of particular reasons.
17 Q  Does any of the reasons that you did not take your
18     practice to the Jaffe law firm have to do with the
19     standard of practice as it relates to this case?
20 A  No. We never heard of this case at the time.
21 Q  Does any of the reasons that you did not take your
22     practice to the Jaffe law firm have to do with the way
23     in which the firm practices law, in general?
24 A  No.
25 Q  Do you know Lee Kellert?

Page 27

1 A  No.
2 Q  Do you know any of the other attorneys at the Jaffe law
3     firm?
4 A  I met a couple during the meeting we just mentioned,
5     whose names I'm afraid I can't recite.
6 Q  How many hours did you spend either reviewing documents,
7     or preparing the expert report that's Exhibit No. 56?
8 A  I could give you a precise answer if I checked my time
9     records, so this will have to be a guess.
10        Between reviewing documents, and preparing the
11     report, I'm going to guess 50 is an order of magnitude.
12 Q  Of those 50, how many hours were spent reviewing the
13     documents that are listed on Exhibit 56, in
14     Subsection II, "Documents Reviewed in Preparation of
15     Expert Opinion"?
16 A  So 50 is a guess. Of whatever the number actually is,
17     I'm going to guess about 40 percent. So if the
18     denominator is 50, that would be 20 hours.
19 Q  In this case, there's been invoices from Butzel Long
20     from you for August 2016 and September 2016. Did you
21     send out invoices since September of 2016?
22 A  I would have for sure, yeah.
23 Q  Did you send out invoices on a monthly basis?
24 A  We -- that is our practice.
25 Q  And that is, indeed, what occurred -- what occurred in

Page 28

1     this case?
2 A  I can't tell you without checking the records, but I
3     have no reason to believe, otherwise.
4        MR. HENGEVELD: Could we go off the record a
5     minute?
6        (Off-the-record discussion.)
7 BY MR. HENGEVELD:
8 Q  Since issuing your report -- that being Exhibit 56 --
9     how many hours did you spend on this case?
10 A  Well, I'd love to be able to check the records to give
11     you an exact answer, so this will have to be a guess
12     again. The report was issued in early December. I'm
13     going to guess 30 since then, 20 to 30.
14 Q  How many telephone conversations have you had with
15     Jeff Goulder or Michael Vincent after issuing your
16     report?
17 A  On the order of five.
18 Q  What did you do to prepare for your deposition today?
19 A  I reviewed all the documents and I talked with
20     Mr. Goulder.
21 Q  You said "reviewed all the documents." Are you
22     referring to those documents listed in your report, as
23     well as the depositions you mentioned, as well as the
24     defendants' expert reports in this case?
25 A  As well as my own report, yes.



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
29–32

Page 29

1  Q   How long did you meet with Mr. Goulder, or talk with
2       Mr. Goulder, prior, in preparation for your deposition
3       today?
4  A   I met with him for, perhaps, 30 minutes yesterday. And
5       you asked "or talk" with him, and I think during the
6       additional phone calls, probably another 10 or
7       15 minutes.
8  Q   Back to Exhibit 56, I'm turning your attention to
9       page number 4.
10 A   Um-hmm.
11 Q   Under Subsection IV -- sorry -- under Section IV,
12      Subsection A, paragraph number 1, you state that:
13             Based on the documents I have reviewed, it
14      appears that Jaffe, Raitt did not carefully identify its
15      client at the time of the acquisition.
16             Do you see that?
17 A   Yes.
18 Q   What documents, in particular, lead you to conclude that
19      Jaffe, Raitt did not carefully identify its client at
20      the time of the acquisition?
21 A   For this conclusion, the documents were the depositions
22      of the Jaffe lawyers, and the exhibits to those
23      depositions.
24 Q   Do you recall any document, in particular, that was an
25      exhibit to those depositions?

Page 30

1  A   My recollection is that the -- there was an engagement
2       letter produced during one of the -- during the course
3       of one of the depositions that was attached, and so that
4       document, as well as the answers, I believe, in
5       Mr. Weiss' deposition.
6              And then, I guess, I would also have to add,
7       as part of the conclusion, the other document that was
8       relevant was the actual transaction document that
9       occurred in the transaction.
10 Q   The closing statement?
11 A   The purchase agreement, whatever it was that -- I can't
12      remember the exact title -- the purchase agreement by
13      which LSI was purchased.
14 Q   Do you agree that a written engagement letter with a
15      client is not required under the standard of care?
16             MR. GOULDER:  Object to the form.  Calls for a
17      legal conclusion.
18             THE WITNESS:  Um, I --
19             MR. HENGEVELD:  Let me rephrase that.
20             THE WITNESS:  All right.
21 BY MR. HENGEVELD:
22 Q   Do you agree that the standard of care applicable to the
23      defendants, in this case, does not require them to have
24      a written engagement letter with their clients?
25 A   No.

Page 31

1  Q   You do not agree with that?
2  A   I do not agree with that.
3  Q   What is your opinion with regard to the requirement that
4       a lawyer and the defendants, in this case, in
5       particular, have a written engagement letter with their
6       clients?
7  A   So you're using the word "requirement" without having
8       defined it.  Your previous question was "standard of
9       care."  My view is strong that the standard of care is
10      that you should have a written engagement letter.
11             If you mean a requirement elsewhere, I need to
12      know what you mean by that.
13 Q   What is the basis for your conclusion that the standard
14      of care requires a written engagement letter?
15 A   My 30 years of practice in trying to make sure that both
16      we, and the lawyer -- we and our client know exactly who
17      is representing whom as to what.
18 Q   So is that based upon your particular practice over
19      30 years?
20 A   My practice, and the standards of all the firms I've
21      been associated with.
22 Q   Can you identify either a Model Rule of Professional
23      Conduct, or a statute, or caselaw, or some other
24      authority, that requires a lawyer to have a written
25      engagement letter with a client?

Page 32

1  A   No.  And I understand that to be a different question
2       than the standard of care.
3  Q   So to be clear, though, the standard of care that you're
4       applying to the defendants, in this case, is a result of
5       your practice at particular law firms throughout your
6       career?
7  A   Yes.
8  Q   Do you make a distinction between what is a best
9       practice versus what is the standard of care in
10      formulating any of your opinions in this case?
11 A   Not in this case.  Obviously, there is a conceptual
12      difference between best practice and standard of care,
13      but, in this case, I don't believe I was asked about, or
14      have opined about, best practices.
15 Q   And, in this case, you believe that Jaffe, Raitt, or the
16      defendants in this case, fell below the standard of care
17      by not having a written engagement letter with their
18      clients?
19 A   Yes, I do.
20 Q   And that's based upon you having written engagement
21      letters for your clients over your career?
22             MR. GOULDER:  Object to the form.  Misstates
23      his prior testimony.
24             THE WITNESS:  Yeah.  It's -- it's not based on
25      what I have done, specifically, so much as it's based on



Page 33

1    having had to decide -- every time we took on a new
2    matter -- who our client was, and having had to reflect
3    that accurately, and all of the conclusions that went
4    into that, as well as the requirements and practices of
5    the various law firms that I've worked for.
6         So it's -- it's -- I get that your question
7    was whether it's just based on what I've done, and
8    that's -- I have to answer no, because it's based on all
9    the things I just listed.
10   BY MR. HENGEVELD:
11   Q   Well, do you agree that a lawyer can still reflect on
12       the accuracy of who his client is, without having a
13       written engagement letter?
14   A   Yes.
15   Q   And do you agree that nothing in the Michigan Rules of
16       Professional Conduct, or -- requires a written
17       engagement letter for this particular engagement in
18       which the defendants were engaged?
19   A   To my --
20            MR. GOULDER:  Object --
21            THE WITNESS:  -- knowledge --
22            MR. GOULDER:  -- to the form.  Asked and
23       answered.
24            THE WITNESS:  To my knowledge, I know of no
25       such requirement in the Michigan rules.

Page 34

1    BY MR. HENGEVELD:
2    Q   Do you have an understanding of the history between
3        CoBe Capital and the Jaffe, Raitt law firm, prior to the
4        LSI acquisition?
5    A   Well -- so that's a pretty vague question.  I'll tell
6        you what my understanding is.  My understanding -- based
7        on what I've seen -- is that there was prior
8        representation by Jaffe of -- and, I believe, the
9        previous engagement letter identified CoBe.
10   Q   Does that history -- that being the prior representation
11       of CoBe Capital by Jaffe -- have any impact on your
12       opinions in this case?
13   A   Yes.
14   Q   How so?
15   A   It seems clear to me that it would have been apparent,
16       from the prior representation, that the people involved
17       with CoBe Capital, as well as the various entities,
18       formed a -- kind of a net of different investment
19       companies, which I've described in my report as being
20       typical of the, sort of, portfolio investor.
21            And that knowledge that Jaffe would have
22       had -- and that was the nature of this set of
23       businesses -- increases my view that Jaffe should have
24       been on high alert for a controlled group liability, in
25       particular, a brother-sister liability.

Page 35

1    Q   Do you have an understanding of the ownership structure,
2        or equity structure, for any of the other acquisitions
3        that CoBe Capital, Neal Cohen, or Darren Chaffee, have
4        been involved with prior to the LSI acquisition?
5    A   The one I have looked at, specifically in connection
6        with my report and my opinion, is the ownership
7        structure of a company called "SSL."  That's the only
8        one that I'm -- as I sit here -- familiar with enough to
9        describe the ownership.
10   Q   In any of the documents that you have reviewed -- and
11       that's including e-mails from Mr. Chaffee and Mr. Cohen,
12       to either Jeff Weiss, or the other lawyers at the
13       Jaffe, Raitt law firm -- did you ever have the
14       impression that CoBe Capital would be acquiring LSI, or
15       that CoBe Capital, itself, would be involved in the
16       acquisition?
17            MR. GOULDER:  Object to the form.  Vague.
18            THE WITNESS:  Yeah.  So did I ever have the
19       impression?  That's a difficult question to answer.
20            What I can tell you is that that is an area
21       where the e-mails, and the other documents, are very
22       unclear.
23   BY MR. HENGEVELD:
24   Q   Going back to Exhibit 56, Sub- -- sorry -- Section IV,
25       paragraph -- Subsection A, paragraph 2, says:  Based on

Page 36

1    the documents I have reviewed, it seems clear that
2    Messrs. Cohen and Chaffee were, as individual investors,
3    seeking guidance on their own behalf.
4         Do you see where I read that from?
5    A   I do.
6    Q   What documents, specifically, then, are you referring to
7        that you believe made clear that Mr. Cohen and Chaffee,
8        as individuals, were seeking guidance from the Jaffe law
9        firm?
10   A   For this one, it's -- in particular, it's an e-mail,
11       which, I believe, is from -- I'm going to say --
12       April 3, 2013.
13   Q   I'm handing you what has been previously marked as
14       Exhibit No. 7, in this case.  Is this the document that
15       you're referring to, the e-mail you're referring to?
16   A   Yeah.  This -- this is the thread that includes that
17       e-mail.
18   Q   So where, in particular, do you believe that it makes
19       clear that Cohen and Chaffee were -- as individual
20       investors -- seeking guidance from Jaffe?
21   A   So this is in -- we're looking at this thread -- it's
22       the e-mail from Wednesday, April 3, 2013, at 10:43 a.m.,
23       and it's the third paragraph.
24   Q   Can you read, for me, what you're referring to,
25       specifically?



Page 37

1  A   Sure.
2        One of the big issues in this deal is the
3  facility's union, and they sponsor a multiemployer
4  pension plan.  The potential clawback on the withdrawal
5  liability is a risk that HNI has.
6        We also want to be sure that we aren't
7  personally liable for other assets/companies at risk.
8  We want to discuss this further.  I understand the risk
9  around this pretty well, because we've been researching.
10 Q   Is it your opinion, in this case, that the defendants
11     represented SSL Assets in some capacity?
12 A   Yes.
13 Q   In your opinion, how is it that the defendants
14     represented SSL Assets in any capacity?
15 A   Because Mr. Chaffee had come forward and effectively
16     said, "We would like you to represent us, personally, as
17     well as the organizations," for which I'm speaking.
18 Q   There's nothing in Exhibit 7 that lists what those
19     entities are that he's seeking representation, on behalf
20     of, or speaking, on behalf of, and, in particular,
21     nothing with regard to SSL Assets; correct?
22 A   Correct.
23 Q   In your opinion, how should the defendants have
24     understood that they were representing SSL Assets, or
25     any other entity?

Page 38

1  A   By this language.
2  Q   By what language, in particular?
3  A   That I just read.
4        That we want to be sure that we are not
5  personally liable, or put our other assets or companies
6  at risk.
7        So I read that as at least arguably equivalent
8  to having said, "I am coming to you to represent us, and
9  our controlled group of companies, to make sure we don't
10 have controlled group liability."
11 Q   Is it your opinion that an attorney who advises about
12     potential controlled group liability represents each and
13     every entity that may be a part of that controlled
14     group?
15 A   If they are asked to, yes.  If they are not asked to,
16     no.  You can't say without knowing what the request was.
17 Q   Well, in this particular case, was it your opinion that
18     the defendants represented -- as their clients -- each
19     and every entity that may, or may not, have been part of
20     a controlled group as a result of the acquisition of
21     LSI?
22 A   Yes.  They represented every entity for which
23     Mr. Chaffee was speaking in this e-mail.
24 Q   Do you know what entities those are?
25 A   I do not.  I couldn't list all of them, in any case.

Page 39

1        But, for example, that's irrelevant if
2  Mr. Chaffee had, for example, said expressly, "I hereby
3  request my representation -- I hereby request that you
4  represent all my entities without listing them."
5        There would be no question that I represented
6  them, even though he hadn't listed them.  And what I'm
7  saying is that I view this language as effectively
8  synonymous to that, particularly, given the context.
9  Q   So when you have been involved in those approximately
10     100 acquisitions, did you represent not only the
11     acquiror, but also the entities that the acquiror may,
12     or may not, own?
13 A   Who we represented in each of those acquisitions would
14     have been a function of who we named in our engagement
15     letter.  It's very fact-specific.
16        So, to be clear -- and just getting to the
17     premise of your question -- I'm not saying that by
18     representing one company, you automatically represent
19     all the other companies.
20        I'm saying if the facts are such that the
21     person has come to you, and asked you to represent a
22     bunch of companies, then you represent a bunch of
23     companies.  If they have not, then you don't.
24 Q   And, in this case, is the language -- that you've
25     identified in Exhibit 7 -- the basis for you concluding

Page 40

1  that the defendants represented all of the entities that
2  both Mr. Chaffee and Mr. Cohen owned at the time of the
3  LSI acquisition?
4  A   Yes, I am.  And I'm specifically saying that Jaffe
5  certainly should have operated under that assumption,
6  given the context.
7        So again, you have language that can be read
8  as synonymous to "I'm coming to ask you to represent all
9  my companies."
10        You also just have the fact that the client is
11     particularly worried about all those companies.  And in
12     my experience, under those circumstances, you have to
13     operate as though you represent all those companies, and
14     it's the burden that would be on you, if you think
15     otherwise, to limit the case by writing an engagement
16     letter of that fact.
17 Q   Given your opinion, do you agree that it is the client's
18     responsibility and duty to know what businesses they
19     own?
20 A   When you say "duty," that's under -- that's a vague
21     term.  I don't know what would provide them with a duty.
22        But, I guess, what I'm assuming you're asking
23     is in the context of an interaction like this, is it the
24     client's responsibility to know what businesses they
25     own?



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
41—44

Page 41

1       And certainly the answer is yes. It is their
2    responsibility to know what businesses they own.
3  Q   Do you agree that a lawyer can rely upon the client's
4    knowledge of what businesses they own --
5  A   Sure.
6  Q   -- if --
7       Can you -- do you agree that a lawyer can rely
8    upon the client to know with whom he owns those
9    businesses?
10 A   Yes. But, of course, in certain contexts the word "own"
11   can have technical, specific statutory meaning, and the
12   lawyer can't rely on the client to know that.
13 Q   Do you believe that the level of sophistication of a
14   client impacts the way the lawyer can communicate with
15   the client?
16 A   Yes.
17 Q   So the more sophisticated a client is, the lawyer can
18   communicate in more sophisticated ways? Would you agree
19   with that?
20 A   I would, although I think I might add that, in this
21   case, it might produce a different result, because the
22   more sophisticated client may know that there's a
23   difference between technical equity ownership and
24   economic ownership.
25       And so you might be less likely to be able to

Page 42

1    just rely on a simple word "ownership," and you might
2    have to be more precise for the more technically
3    sophisticated client.
4       MR. GOULDER: If you get to a point where you
5    want a break, just say the word.
6       THE WITNESS: I'm good, but if anybody else
7    here wants to take a break, that's fine.
8  BY MR. HENGEVELD:
9  Q   Let's go back to Exhibit 56. I'm still under
10   Section IV, but now I'm on Subsection B, paragraph 2.
11      Do you see where I'm referring to?
12 A   I do, yes.
13 Q   In that paragraph, you indicate that the clients,
14   themselves, specifically highlighted the issue of
15   potential controlled group liability; correct?
16 A   Correct.
17 Q   Do you know what due diligence Darren Chaffee and
18   Neal Cohen performed, prior to retaining the Jaffe law
19   firm regarding the LSI acquisition?
20 A   I only got the sense that I got by reviewing
21   Mr. Chaffee's deposition.
22 Q   Did you review the exhibits to that deposition as well?
23 A   Very briefly.
24 Q   Do you know, specifically, what due diligence
25   Darren Chaffee or Neal Cohen performed with regard to

Page 43

1    pension withdrawal liability?
2  A   My recollection is this, that Mr. Chaffee had become
3    aware that there was such a thing, partly from a friend
4    of a colleague, and that he and/or his colleagues had
5    done some Internet-based searching around the topic.
6  Q   And that friend you refer to is a lawyer; correct?
7  A   I can't tell you, with certainty, but that is my
8    recollection that it was a lawyer friend who was not
9    practicing as a lawyer, but was at another private
10   equity firm.
11 Q   And do you specifically recall that that lawyer was
12   involved in an acquisition involving pension withdrawal
13   liability?
14 A   Only vaguely. I -- I don't remember the details.
15 Q   Is what you just answered the total and extent to which
16   you have any understanding of what due diligence
17   Mr. Chaffee and Neal Cohen performed with regard to
18   controlled group liability prior to the acquisition of
19   LSI?
20 A   As -- as I remember it, yes.
21 Q   Are you aware that Mr. Chaffee had researched articles
22   regarding controlled group liability, or pension
23   withdrawal liability?
24 A   Yes.
25 Q   And are you aware that Mr. Chaffee had read the

Page 44

1    Sun Capital Partners case prior to retaining the Jaffe
2    law firm?
3       MR. GOULDER: Objection. Assumes facts not in
4    evidence.
5       THE WITNESS: Yeah, I -- I don't remember that
6    part of it, but it wouldn't surprise me.
7  BY MR. HENGEVELD:
8  Q   Are you aware that Mr. Chaffee had researched
9    articles -- for example, an article from
10   Skadden, Arps -- regarding the Sun Capital Partners
11   case?
12 A   I -- again, I didn't remember that it specifically
13   related to Sun Capital, but I did remember -- I did
14   remember Skadden was one of them that he found articles
15   online.
16 Q   In your opinion, is Mr. Chaffee a sophisticated client?
17      MR. GOULDER: Object to the form. Vague.
18   Beyond the scope. That's his opinion.
19      THE WITNESS: Yeah. So I have to say the word
20   "sophisticated" is an extremely -- not just vague, but
21   also a relative term, so I have to say sophisticated
22   with respect to what?
23      If the question is, was he sophisticated in
24   connection with financial transactions, relative to an
25   average person on the street, then that answer is yes.



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
45–48

**Page 45**

1 BY MR. HENGEVELD:
2 Q   What about with regard to sophistication regarding
3       issues of pension withdrawal liability and controlled
4       group liability?
5 A   Absolutely not. He was aware that the issue existed,
6       but in terms of sophisticated understanding of the
7       issue, absolutely not.
8 Q   Do you believe that a nonlawyer client can understand
9       the issues regarding controlled group liability when
10      they're acquiring a business that has, or sponsors, a
11      multiemployer pension plan?
12 A   So the question is:
13           Is it possible for a client to understand
14      those issues?
15 Q   Yes.
16 A   Yes.
17 Q   Are the opinions that you provide, in this case, taking
18      into account the level of sophistication by Mr. Chaffee
19      and Mr. Cohen as it relates to controlled group
20      liability?
21 A   Yes.
22 Q   Again, you deem -- you deem both of them -- that is
23      Chaffee and Cohen -- to be completely unsophisticated
24      regarding controlled group liability issues?
25 A   Well, I'm not sure I'd use the word -- so

**Page 46**

1       "sophisticated," again, is such a vague and relative
2       term. They're sophisticated relative to people who have
3       never heard of the issue, but if we ask ourselves, "Are
4       you sophisticated on this issue? Do you have a
5       sophisticated understanding of this issue?" then
6       absolutely not, they are not sophisticated.
7           And, I guess, I would be willing to say, in
8       your words, "completely unsophisticated," except to the
9       extent they're aware that the issue exists. That's more
10      sophisticated than the average person.
11 Q   Well, do you know whether Mr. Chaffee, or Mr. Cohen, was
12      aware of the brother-sister test, or parent-subsidiary
13      test, regarding controlled group liability prior to
14      retaining Jaffe?
15 A   So I don't know whether they'd heard of it. They might
16      have heard of it.
17 Q   Going back to Exhibit 56, turning your attention to
18      page 8, and the paragraph number 8 at the top of page 8.
19      Do you see that?
20 A   Yes, I do.
21 Q   You say:
22           Crucially, in applying either the
23      parent-subsidiary, or the brother-sister test, ownership
24      must be "attributed" from certain entities and persons
25      to others.

**Page 47**

1           Do you see that?
2 A   Yes, I do.
3 Q   The attribution concept actually derives from the
4       tax code; correct?
5 A   Correct. Well, I guess I have to clarify that.
6       Ultimately, the attribution, in question, is a function
7       of ERISA, but it defines it by cross-reference to the
8       tax code. So the definition stems from tax definitions.
9 Q   Right. The concept of attribution is formed via the
10      tax code, and is applied, in this particular case, under
11      the ERISA law --
12 A   So that --
13 Q   -- statutes?
14 A   -- phrasing doesn't compute for me. The concept being
15      formed and applied in this case.
16           The way -- the way I phrase it is, ERISA
17      imposes attributed ownership, and defines it by
18      cross-reference.
19 Q   Going back to Exhibit 56, page 8, paragraph number 9.
20      In there you state that:
21           Because of these detailed, intricate ownership
22      tests, the most common approach to gaining a confident
23      understanding of the extent of controlled group status
24      is to obtain or create, with the client's input, an
25      organizational chart.

**Page 48**

1           Do you see that?
2 A   I do.
3 Q   Does the standard of care require that an organizational
4       chart be obtained, or created, when rendering advice
5       about whether there's controlled group liability?
6 A   So if the question is:
7           Can the standard of care be met without an
8       organizational chart?
9           The theoretical answer is no.
10          What the standard of care requires is that you
11      develop a complete understanding of the organization,
12      and if it's possible for you to do that, simply by means
13      of words -- A company owns B company, which is
14      30 percent owned by C company, et cetera -- that
15      theoretically can suffice.
16          But, in my experience, the way the human brain
17      works, the only way to get the actual understanding
18      necessary to perform the standard of care for a
19      complicated organization is through a chart.
20          But, nonetheless, if your brain worked the
21      right way, theoretically you could acquire the
22      information without a chart.
23 Q   Okay. So then, to be clear -- I want to make sure that
24      your prior answer was accurate -- theoretically, you are
25      able to comply with the standard of care without an



Page 49

1    organizational chart; correct?
2  A  Correct. I've never met anyone, I think, that could do
3    that, but correct, theoretically.
4  Q  Well, if you had a client that did not have any common
5    ownership with another individual or a company, that was
6    part of the acquisition of an entity with a
7    multiemployer pension plan, then you could -- without
8    having an organizational chart -- conclude that there is
9    no brother-sister tests -- or, sorry -- there's no
10   brother-sister relationship for controlled group
11   liability; correct?
12       MR. GOULDER: Objection. Vague and assumes
13   facts not in evidence.
14       THE WITNESS: So the one point I'll note with
15   your question and answer, is that there is a vague term
16   used in the preface to your question, which is the term
17   "common ownership."
18       If you unpack that term to say
19   common ownership under all the relevant regs and
20   statutes, then the answer to your question is yes.
21 BY MR. HENGEVELD:
22  Q  Have you seen an ownership chart of Darren Chaffee's
23   ownership interests in any entities that he owns?
24  A  So I have seen various charts. I don't know -- I may,
25   or may not, have seen a chart that purported to be a

Page 50

1    complete chart of Darren's ownerships.
2        The one I had focused on is just an ownership
3    chart of SSL.
4  Q  Is it the attorney's duty to create an organizational
5    chart for the client?
6  A  Of course not. The attorney's duty is to acquire a full
7    understanding of the network of ownership interests.
8  Q  Do you agree that only the client can provide the
9    ownership interests for the attorney to assess?
10  A  Well, that depends on the facts. I suppose, in some
11   cases, it might be public. But in -- in this case, I
12   have no reason to believe Jaffe could have produced the
13   organizational chart without having asked the
14   information necessary to produce it, so no.
15  Q  That is, so, yes, you agree that --
16  A  In this case --
17  Q  -- only Darren Chaffee or Neal Cohen could have provided
18   the ownership interests, or their -- any of --
19   interest -- or entities that they had an interest in?
20  A  Yeah. So I'm just trying to make the question more
21   precise, so I can answer it.
22       I think your original question was "only the
23   client" can do that, and I -- so precisely rephrasing
24   the question, and answering it:
25       In this case, between Darren and Neal and

Page 51

1    Jaffe, only Darren and Neal could have provided an
2    organizational chart.
3  Q  Thank you.
4  A  Sure.
5  Q  With regard to your opinion in Exhibit 56, page 8,
6    Subsection D, where it states:
7        Once it arises, controlled group liability,
8    under Title IV of ERISA, cannot be escaped through
9    corporate divestiture or reorganization.
10  A  Um-hmm.
11  Q  Do you -- first of all, do you see that?
12  A  Yes, I do.
13  Q  A pension withdrawal liability has not been assessed
14   against LSI, or LSI Holdings of America, LLC, or
15   SSL Assets; correct?
16  A  I don't know.
17  Q  Well, only the trustees of the Pension Fund can assess
18   pension withdrawal liability; correct?
19  A  That's my understanding.
20  Q  And you've not seen any evidence, in this case, that the
21   trustees of the Pension Fund have assessed
22   pension withdrawal liability; correct?
23  A  I don't believe I have, no.
24  Q  Do you agree that the evading and avoiding section of
25   ERISA does not prevent a business from changing its

Page 52

1    ownership structure, so long as there are -- are
2    good-faith nonwithdrawal liability reasons for making
3    the changes?
4  A  I absolutely do not agree with that statement. The way
5    you phrased that statement is, so long as there are
6    other reasons. It restates the question as though it's
7    a test of whether it's a sham that states the tax sham
8    transaction question.
9        The test, in this case, is whether any
10   reason -- any of the reasons -- includes escaping
11   liability. So the mere fact that you can identify one
12   or more other reasons does not allow you to do this
13   transaction. So I completely disagree with the way you
14   stated it.
15  Q  Well, just because there is the evading and avoiding
16   section of ERISA, that doesn't prevent a business from
17   changing its ownership structure if the reason for
18   changing it isn't to avoid pension withdrawal liability;
19   correct?
20  A  Correct. If it's a complete, unanticipated side effect,
21   then it doesn't prevent it, and that's a question of
22   fact.
23  Q  And the fund has the burden to prove that the change in
24   ownership was intended to evade or avoid
25   pension withdrawal liability; correct?



Page 53

1   A   I don't remember the burden of proof. I don't know.
2   Q   Would you agree with me that businesses change their
3       ownership structure all the time for various reasons
4       that are not related to pension withdrawal liability?
5   A   Yes, I would.
6   Q   Once pension withdrawal liability is assessed -- that
7       is, by the fund -- can the sponsors of the plan
8       negotiate to reduce the amount of that pension
9       withdrawal liability?
10  A   My understanding is yes.
11  Q   Have you ever been involved in such a negotiation?
12  A   I have not.
13  Q   Have you ever had a client that has been assessed
14      pension withdrawal liability?
15  A   I have not. Oh, no, I'm sorry. I have. I have had a
16      client that's been assessed pension withdrawal
17      liability.
18  Q   And have you, in that situation, been asked to attempt
19      to reduce the pension withdrawal liability?
20  A   I have.
21  Q   And what steps did you take to attempt to reduce that
22      pension withdrawal liability?
23  A   I negotiated with the trustees.
24  Q   And were you able to reduce the amount of pension
25      withdrawal liability in that case?

Page 54

1   A   Yes, I was.
2   Q   By what percentage were you able to reduce the
3       pension withdrawal liability?
4   A   That, I just don't remember. It was probably on the
5       order of 10 percent.
6   Q   How was it that you were able to negotiate down that
7       amount of pension withdrawal liability?
8   A   I'm not quite sure what you're asking.
9   Q   What arguments did you make, on behalf of your client,
10      to reduce the amount of --
11  A   So --
12  Q   -- pension withdrawal liability?
13  A   So this is one client -- and this is probably six years
14      ago, so I'm -- and I'm just bringing it to mind, and I'm
15      having trouble remembering exactly what our argument
16      was.
17          Oh, I think it actually had to do with the
18      limitations period. I think we argued that they had
19      possibly missed the period for assessing the liability.
20  Q   And what is the statute of limitations period with
21      regard to the fund assessing pension withdrawal
22      liability?
23  A   I'm sorry. I don't remember.
24  Q   Do you know whether the trustees of the fund take an
25      ability to pay into consideration when negotiating down

Page 55

1       the pension withdrawal liability amount?
2   A   I don't know. I have no experience with that.
3   Q   Are there any other factors that the trustees of the
4       fund take into consideration in negotiating down the
5       amount of pension withdrawal liability?
6   A   So --
7           MR. GOULDER: Object to form and foundation.
8           THE WITNESS: I just don't know.
9   BY MR. HENGEVELD:
10  Q   Do you have any opinions, in this case, about whether
11      SSL Assets has a duty, or responsibility, to attempt to
12      mitigate any alleged pension withdrawal liability that
13      might be assessed?
14  A   I don't know.
15  Q   Do you agree that Darren Chaffee and Neal Cohen are not
16      subject to pension withdrawal liability as a result of
17      the LSI acquisition?
18  A   I can't --
19          MR. GOULDER: Objection. Calls for a legal
20      conclusion.
21          THE WITNESS: Yeah, I can't -- I just don't
22      know. I'd have to analyze it. That's not something
23      I've analyzed.
24  BY MR. HENGEVELD:
25  Q   Have you been asked to analyze whether this particular

Page 56

1       multiemployer pension plan could be deemed to be a
2       construction industry plan?
3   A   I have -- the -- the -- the question has been raised
4       with me by Stinson, and I have briefly looked at it.
5   Q   And when was that raised --
6   A   It was --
7   Q   -- first raised with you?
8   A   It was first raised after my report. I'd say maybe late
9       December, or early January. I don't remember exactly
10      when.
11  Q   And what were you specifically asked to do regarding
12      whether this is a construction industry plan?
13  A   I was asked for a quick view as to whether I thought
14      that that exception might apply.
15  Q   Did you form a conclusion as to whether that exception
16      might apply?
17  A   I formed a preliminary conclusion that it does not
18      apply.
19  Q   And what is that conclusion based upon?
20  A   So my understanding is that the construction industry
21      exception is defined by reference to caselaw under labor
22      law, and I believe it's the LMRA, but I'm not certain of
23      that recollection.
24          But my understanding is that the caselaw --
25      the definition of construction industry is relevant for



ANDREW W. STUMPFF                                      February 09, 2017
COHEN vs JAFFE                                                    57—60

Page 57

1    those purposes under labor law, and has been the subject
2    of cases defining what is a construction industry
3    company, and that the test is something along the lines
4    of the company's work being predominantly done on the
5    construction job site.
6          So in the case of new building construction
7    the new work is predominantly done on the job site. And
8    so my preliminary understanding of both the rule and the
9    facts here, is that testimony applied here, because too
10   much of this company's work was not done at the
11   construction site.
12 Q   And what do you base that conclusion on in terms of the
13   facts?
14 A   My understanding, my very brief understanding, that I
15   could draw from the documents that this -- and I think
16   that Stinson has told me -- that this company
17   manufactures shelving and cabinetry, and does some
18   installation, but my understanding is not enough to meet
19   the test under this caselaw.
20 Q   What would be the impact if this were to be deemed a
21   construction industry plan?
22 A   Then the -- my understanding -- and this is not an area
23   that I've spent a lot of time in -- is that the
24   withdrawal liability would not apply.
25 Q   Going back to Exhibit No. 56 --

Page 58

1 A   Yeah.
2 Q   -- page number 10, paragraph number 4 on that page,
3    starts with "Analysis of the ownership structure."
4          Do you see that?
5 A   I do.
6 Q   Do you know what documents existed at the time that
7    Jaffe rendered its advice on controlled group liability
8    that you believe Jaffe should have had before rendering
9    that advice?
10 A   Do I know what documents exist that Jaffe should have
11   had? Um --
12 Q   And -- sorry -- specifically with regard to Exhibit --
13   sorry -- paragraph number 4 on page 10, and that is your
14   reference to the analysis of the ownership structure?
15 A   Um-hmm.
16 Q   I guess my more precise question is:
17          What, specifically, are you referring to of
18   the analysis of ownership structure?
19 A   So I'm referring to the facts of the ownership
20   structure, what they owned. I'm not actually referring
21   to a document. I don't know what documents existed.
22          I'm referring to the facts, as they existed,
23   and analysis of those facts should have led to that
24   conclusion.
25 Q   Exhibit 56, page 10, paragraph 6 on that page: Information

Page 59

1    about indirect ownership of interests held by
2    Messrs. Cohen and Chaffee would have had to be elicited
3    from these individuals by Jaffe, Raitt, in order
4    correctly to characterize the risk of triggering
5    potential controlled group liability on the part of SSL
6    as a result of the acquisition.
7          Do you see that?
8 A   Yes.
9 Q   Do you agree with me that that information about the
10   indirect ownership interests, owned by Cohen and Jaffe,
11   could be elicited orally?
12 A   Yes.
13 Q   When you say "indirect ownership interests," what are
14   you referring to, in particular?
15 A   Any indirect ownership would have to be elicited. In
16   this case, what turned out to be -- what turned out to
17   exist, and be relevant, was indirect ownership through
18   intervening companies.
19          Other types of indirect ownership that would
20   have to be asked about, as well, turned out not to be
21   relevant here.
22 Q   Let me ask you about both. What are you specifically
23   referring to with regard to the -- what you deemed as to
24   be "intervening companies"?
25 A   So, for example, in the case of SSL, neither

Page 60

1    Mr. Chaffee, nor Mr. Cohen, owned an interest in SSL.
2    Mr. Chaffee and Mr. Cohen each owned interests in other
3    entities, which owned interests in SSL.
4          That is indirect ownership, and so you would
5    need to elicit information about indirect ownership in
6    order to be able to make this analysis.
7 Q   In your prior answer you mentioned indirect ownership
8    that you said turned out not to be relevant. What are
9    you referring to in that --
10 A   So --
11 Q   -- answer?
12 A   So, for example, the attribution rules are fairly broad,
13   and if, for example, a family member owns stock in a
14   company, that may have to be attributed to you, if we're
15   asking about you.
16          So the question, sort of, goes to how precise
17   one has to be when one asks about ownership, because of
18   the potential for indirect ownership from many different
19   sources, only one of which turned out to be relevant
20   here.
21          But had the precise question been asked, it
22   would have elicited that, as well as all the other
23   possible relevant forms of ownership.
24 Q   And are you referring to something specifically with
25   regard to Neal Cohen or Darren Chaffee's interests, or

ANDREW W.  STUMPFF
COHEN vs JAFFE

February 09, 2017
61–64

Page 61

1    their spouses' interests, in this case?
2  A   No.  No.  I'm -- here's what I'm saying -- I'm saying
3    that when you're trying to analyze, or when you're
4    asking someone -- well, strike that.
5       When you're trying to answer for someone,
6    whether they are part of a controlled group, because of
7    the way the attribution rules work, you have to ask a
8    number of very precise questions, because it can turn
9    out that stock that you wouldn't have thought about,
10    might be taken into account, for example, your family
11    members, so you have to ask all these precise questions.
12       In response to your question, in this case it
13    turned out that none of that was relevant, except for
14    the indirect part.  But the standard -- the standard of
15    care is that you have to ask all of those, because you
16    don't know, in advance, that those are not going to turn
17    out to be relevant.
18  Q   Turning your attention to paragraph -- Exhibit 56,
19    page 11, paragraph 1 on that page, what documents and
20    testimony are you referring to, specifically, when
21    you're talking about the question asked by Jaffe, Raitt,
22    and that Mr. Cohen answered in the negative?
23  A   I believe this is all from Mr. Weiss' deposition, but I
24    think it's also something, to this effect, in some of
25    the other Jaffe lawyers' depositions.

Page 62

1  Q   So you're not necessarily referring to the document,
2    you're just referring to the testimony by Mr. Weiss, or
3    by the other Jaffe attorneys?
4  A   Yeah.  I guess in the same documents.  I guess I had the
5    depositions in paper form, so...
6  Q   Okay.  And is it actually a question that Mr. Cohen
7    answered, or is it a question that Mr. Chaffee answered?
8  A   Oh, you're right.  This is probably a mistake in my
9    report, because I think that Mr. Weiss' deposition is
10    about a conversation with Mr. Chaffee, and not
11    Mr. Cohen.
12  Q   Do you agree with me that if there is, indeed, no common
13    ownership of entities between Mr. Chaffee and Mr. Cohen,
14    that, then, there is no further analysis that needs to
15    be done regarding controlled group liability for
16    brother-sister tests?
17  A   I can't agree with that for the reason that the term
18    "common ownership" is too vague and susceptible with
19    different meanings, one of which would allow -- at least
20    one of which would allow the answer to be positive, and
21    the others which -- others of which would allow it to be
22    negative.
23  Q   Well, how so would it be negative?
24  A   So ownership can have a number of different meanings,
25    and one of the possible meanings of ownership -- if I

Page 63

1    ask Mr. Chaffee, for example, "Do you own any SSL
2    equity?" under one of the meanings of "common ownership"
3    the answer is, no, Mr. Chaffee does not own any stock in
4    SSL.
5       So, as a result, the question is sufficiently
6    vague in the sense that it can be interpreted reasonably
7    in a way that would allow a negative answer, without
8    having eliminated the possibility that -- that the
9    regulation's attribution rules have been met, that one
10    would have to follow up.
11       There's no way to decide, on the basis of that
12    question, on whether you have a controlled group or not,
13    without having stated, precisely, what one means by the
14    vague term "common ownership."
15  Q   Well, do you agree with me that as an ERISA lawyer, if
16    you're told that there is no common ownership between
17    two clients that are acquiring an entity with a
18    multiemployer pension plan, you would not need to do any
19    further analysis with regard to whether there was
20    controlled group liability?
21  A   So two -- two things.  So, first, you again just used
22    the word "common ownership."  So everything I said in my
23    previous answer, it's too vague.  But you prefaced it by
24    saying "as an ERISA lawyer."
25       So if, by that, you meant if someone said to

Page 64

1    me, "Assume that for purposes of ERISA, there is no
2    common ownership," then the answer is yes.
3       But if they just say "common ownership" --
4    whether I'm an ERISA lawyer, or anyone else -- the
5    answer is no.  I would require more analysis.
6  Q   Have you formed any specific opinions with regard to
7    Deb Baughman's services in this case?
8  A   No.
9  Q   Are your opinions and criticisms, in this case, limited
10    then to how Mr. Weiss obtained the information as to
11    what ownership interests Darren Chaffee and Neal Cohen
12    had?
13  A   Here's --
14       MR. GOULDER:  Object to the form.
15       Go ahead.
16       THE WITNESS:  Here's how I've analyzed it.
17    I've looked at all of the communications from the firm
18    to the client, without regard to who was making the
19    communication, almost as though it were one person.
20       So I'm not making any distinctions about any
21    individual lawyer at Jaffe.  I'm saying that if you take
22    Jaffe as the lawyer here, and assume that these
23    questions were asked as stated, and answered as stated,
24    that the conclusions I've drawn are what I've drawn.
25       MR. HENGEVELD:  Let's take a quick break.



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017

65–68

Page 65

1     (Whereupon a break was taken
2     from 9:46 a.m. to 9:55 a.m.)
3  BY MR. HENGEVELD:
4  Q   Going back to Exhibit No. 56, page 11,
5     paragraph number 3 on that page. Do you see that
6     paragraph?
7  A  Yes, I do.
8  Q   In the last sentence of paragraph 3, you state:
9        That, however, raises the question of whether
10    it met the standard of practice in such a context simply
11    to have asked, of a client, "Do you have any common
12    ownership of another entity?"
13        Do you see that?
14  A  Yes, I do.
15  Q   If a client is familiar with the attribution rules, and
16    their understanding of their ownership interests, and
17    all the entities in which they have an interest, do you
18    agree that a lawyer asking whether -- or asking the
19    client to list all the entities in which he has an
20    ownership interest in common with another acquiror,
21    meets the standard of care?
22  A  So the way you asked the question was, if -- if the
23    client has an understanding of the attribution rules.
24        And so I would answer your question, yes, with
25    the following amendment: If the client understands the

Page 66

1     attribution rules, and the lawyer knows that the client
2     understands the attribution rules, then to -- to get a
3     response saying, "Do you have any common ownership of
4     another entity?" where the lawyer knows that the client
5     is understanding that, in the context of those
6     attribution rules, that would meet the standard of care.
7  Q   What about a lawyer asking a simple question, "What
8     businesses do you own in common with the other
9     acquiror?"
10        Does that meet the standard of practice for
11    determining whether there is a basis upon which to
12    conclude that there might be potential controlled group
13    liability?
14  A  No. The words "in common" are fatally vague. They
15    permit an answer that would say, no, it does not provide
16    the lawyer the information they need.
17  Q   What about the question, "Do you own any businesses with
18    the other acquiror?"
19  A  Again --
20  Q   Does that --
21  A  -- that's --
22  Q   -- meet the --
23  A  -- too --
24  Q   -- standard --
25  A  -- vague.

Page 67

1  Q   -- of care?
2  A  It's too vague.
3  Q   The word "own" is vague, in your opinion?
4  A  It is.
5        And again, I think especially, in this case,
6     where you have someone who has not necessarily ERISA
7     sophistication, but some business and transactional
8     sophistication, and has focused, in the past, for
9     example, on the fact that there are intervening
10    entities, and it's been important to him -- for whatever
11    reason -- in the past, that there is an intervening
12    entity, such that he is able to answer the question,
13    "Do you own X?" in the negative, even though he owns an
14    intervening entity that owns X.
15        It's again -- when you ask a question -- as a
16    lawyer, in this context, when you ask a question that's
17    capable of a truthful affirmative answer, that if
18    understood a certain way will not have given you the
19    information you need, then you have not met the standard
20    of care in helping that client figure out whether
21    they've got a controlled group.
22  Q   In your opinion, what question should have been asked,
23    by the Jaffe attorneys, in evaluating the potential for
24    controlled group liability in this case?
25  A  Right. There's effectively two ways to have done it,

Page 68

1     and probably both are -- are the best way to do it.
2        One is to effectively summarize or recite the
3     attribution rules, and say, taking into account any
4     direct or indirect ownership, as well as any other
5     attributed ownership -- for example, family members --
6     does it turn out that if you drew the ownership lines,
7     you would have an indirect, or direct, or attributed
8     ownership interest in a company in which Mr. Cohen also
9     had a direct or indirect or attributed ownership?
10        The other way to do it, which is conceptually
11    equivalent -- and again, I think, works better, given
12    the human brain -- is to ask for an organizational chart
13    that shows boxes for all the entities with lines showing
14    ownership interest.
15        But even there, you would have to note that
16    the organizational chart would have to be supplemented
17    to show any of these attributed ownership rules that I
18    mentioned.
19  Q   And you agree that that question could be asked orally?
20  A  Yes.
21  Q   You indicated, in your answer, that that's the best way
22    to do it. Do you believe that that's what the standard
23    of practice requires?
24  A  What I -- what I said, in my answer, was the best way



Page 69

1  would have been to do it both ways.  The standard of
2  practice would require that you do it at least one of
3  the other way.
4  Q  And what, specifically, are you referring to that
5  formulates your opinion that that is what the standard
6  of practice is?
7  A  Because there's no other way to analyze control groups
8  properly and correctly.  There's no other way to analyze
9  control group existence, correctly, other than with all
10  of the facts that are required to be taken into account
11  by the tests.  There's no other way to get the necessary
12  information.
13  Q  Are you basing your opinion regarding the standard of
14  practice, then, on your particular experience in
15  practicing law --
16  A  Well --
17  Q  -- or are you basing it on a statute, Model Rules of
18  Professional Conduct, Michigan Rules of Professional
19  Conduct, caselaw, or some other source?
20  A  I'm basing this answer, I guess, in response to this
21  question, on two things.
22     One, the logical requisite that you can't
23  answer the question of whether it's a controlled group,
24  without having gotten all this information.  So just
25  sheer logic, you have to have acquired certain

Page 70

1  quantitative information to be able to answer this
2  question under the statute.
3     I am also -- although, I think that would be
4  the same answer, even if this was the first time I'd
5  ever seen this question, you'd just look at the question
6  and you'd say, "What do I need to answer it?"
7     But it's also based on all of the transactions
8  I've been involved in, and all the private equity
9  clients I've ever advised, all the investment companies
10  I've ever advised, knowing that they tend to have these
11  complicated networks, companies with ownership going in
12  different directions, that you have to be particularly
13  inclusive.
14     So it's all of those things, but, ultimately,
15  it's just a logical answer.  You can't -- you cannot
16  answer this statutory question without having elicited
17  all of this information.
18  Q  If the information elicited about ownership -- either
19  direct or indirect -- reflects that there is no direct
20  or indirect common ownership between the two acquirors,
21  would you agree with me that that would end the inquiry
22  regarding controlled group liability?
23  A  Yes, I would.
24  Q  Exhibit 56, page 12, the last sentence of paragraph 5 --
25  which was a continuation of the paragraph from the

Page 71

1  previous page 11 -- the last sentence in paragraph 5
2  says:
3     Under such circumstances a very thorough,
4  direct set of questions and requests for detailed
5  ownership information was called for.
6     Do you see that?
7  A  Yes, I do.
8  Q  The direct set of questions and requests do not have to
9  be in writing; correct?
10  A  Correct.
11  Q  Exhibit 56, page 12, paragraph 7 on that page, you state
12  that the attorney has to explain the existence and
13  summarize the general outlines of the ownership
14  attribution rules under the regulations; correct?
15  A  Yes.
16  Q  Is that true even in the circumstances that the client
17  knows of the attribution rules?
18  A  Not if -- you stated the question if the client knows of
19  the attribution rules.  That doesn't help at all.
20     The client would need to know, exhaustively,
21  the content of the attribution rules, and you would have
22  to know that.  If you, the lawyer, know that the client
23  has an exhaustive understanding of the content of the
24  attribution rules, then, as we've said -- I think I've
25  already said -- then I wouldn't say that the standard of

Page 72

1  care requires that you repeat those to the client.  But
2  knowing of them, doesn't help at all.
3  Q  In your opinion, would most certified public accountants
4  know the attribution rules?
5     MR. GOULDER:  Object to form and foundation.
6     THE WITNESS:  And I'll answer that, in my
7  opinion, it would be an extremely rare CPA who would
8  know the attribution rules that apply for purposes of
9  ERISA liability.
10  BY MR. HENGEVELD:
11  Q  Well, those attribution rules we've already covered,
12  though, arise out of the tax code; correct?
13  A  So if you told a CPA you had to work on corporate tax
14  returns and controlled group returns, and you knew that
15  the CPA had to work on controlled group returns, and you
16  told the CPA, "For purposes of this ERISA-controlled
17  group analysis, we have to apply all of the same
18  controlled group rules that you've had to apply for
19  purposes of the controlled group returns you've worked
20  on," then I think you could probably be safe.
21  Q  Let's be more simplistic on that.  You would expect a
22  CPA to understand the concept of pass-through entities;
23  correct?
24  A  Pass-through entities has absolutely no relevance here.
25  So the attribution rules would apply whether we were



Page 73

1    talking about an LLC, or a C Corp., or a partnership.
2         And, moreover, as I've said before, it turned
3    out not to matter here, but, actually, to have asked the
4    question, you would have needed to apply all the other
5    attribution rules, which are specific to these
6    attribution rules, like family members, and so forth.
7         So the pass-through rules apply not for
8    purposes of defining a control group, even under the
9    tax code. The pass-through rules apply for purposes of
10   making the owner essentially reflect all of the
11   tax income and expenses of the entity, itself.
12        It has nothing to do, even on the tax side,
13   with defining controlled group.
14 Q   The concept is similar -- the concept -- strike that.
15        The concept of a pass-through entity is the
16   concept of attribution?
17 A   For one particular context. For other particular
18   contexts it is an actual, effective legal barrier.
19        And my recollection of the depositions here is
20   that Mr. Chaffee, at least, was aware -- I'm not sure he
21   was aware of the reasons -- but he was aware that there
22   was an intermediate entity that had substance, and that
23   that existence of the substantive intermediate entity
24   had importance, completely, without regard to the
25   pass-through of tax attributes.

Page 74

1 Q   Going back to Exhibit 56, paragraph 6, on page 12, in
2    there you state that Jaffe, Raitt should have asked
3    specific follow-up questions necessary to confirm the
4    existence of common ownership. Do you see that?
5 A   Paragraph 6? Oh, yes, I see it.
6        MR. GOULDER: Paragraph six.
7        THE WITNESS: I see it, yes. I'm sorry.
8        MR. HENGEVELD: That's okay.
9 BY MR. HENGEVELD:
10 Q   What specific follow-up questions do you believe
11   Jaffe, Raitt should have asked that the lawyers in that
12   firm did not ask?
13 A   Here's the main one:
14        Here are the attribution rules. I'll list
15   them, taking these into account you have common
16   ownership.
17 Q   Do you agree that the advice that Jaffe, Raitt rendered
18   to Darren Chaffee and Neal Cohen was based upon the
19   information that they -- Darren Chaffee and
20   Neal Cohen -- gave to the Jaffe attorneys?
21 A   I have to answer that question, yes.
22 Q   Have you ever created an organizational chart for a
23   client with regard to the acquisition of an -- of an
24   entity?
25 A   Well, it's been a long time, so it's hard to say,

Page 75

1    definitively, but I don't remember ever creating an
2    organizational chart for Neal.
3 Q   Exhibit 56, page 12, paragraph 8, talks about subtleties
4    implicit in the question about, "Do you have any other
5    common ownership?"
6        Do you see that?
7 A   Yes, I do.
8 Q   What specific subtleties are you referring to implicit
9    in that question?
10 A   Most of what we've been talking about, and particularly
11   the attribution rules, and the indirect ownership
12   rules -- well, strike the "and the indirect ownership
13   rules."
14        It all really falls under the attribution
15   rules.
16 Q   Again, nothing beyond what we've --
17 A   Right.
18 Q   -- what you've already testified to --
19 A   Right.
20 Q   -- regarding the --
21 A   Right.
22 Q   -- attribution rules?
23 A   Right.
24 Q   On page 13 of your report, paragraph 2, it talks about
25   there being amendments or additions to the report that

Page 76

1    you may develop if there's new evidence, et cetera.
2        Are all of the opinions, to which you
3    testified about today, the sum total and entirety of the
4    opinions that you have formulated in this case?
5        MR. GOULDER: Object to the form of the
6    question. His opinions are set forth in the report --
7        THE WITNESS: Um --
8        MR. GOULDER: -- and his testimony today.
9        THE WITNESS: You know, I'll try to answer it,
10   but it's a really hard question, because you're asking
11   me all the opinions I might have -- like I've formed a
12   number of opinions about this room since I've been here.
13        I mean, you know, I --
14        MR. HENGEVELD: Let me rephrase the question.
15 BY MR. HENGEVELD:
16 Q   Are there any other opinions that you have that relate
17   to this case, other than those set forth in Exhibit 56,
18   which is your report, or that you have testified about
19   today?
20 A   None that are relevant to the scope of my engagement,
21   but it's such -- I'm sorry -- it's just such an
22   incredibly broad question, "Have I formed any opinions?"
23        It's, like, opinions, like, there's lots of
24   people doing transactional work. I mean, there's just
25   so many opinions. You asked how many opinions have I



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
77–80

Page 77

1   formed about the case.
2       It's interesting that this investment bank
3   exists in New York, and does business. There's lots of
4   opinions I formed. If the -- but if the question is:
5       Have I -- is this the sum total of the
6   opinions I have formed about whether this law firm met
7   the standard of care, the answer is yes.
8       MR. HENGEVELD: Thank you.
9       Give me a moment --
10      THE WITNESS: Okay.
11      MR. HENGEVELD: -- to look over my notes.
12      THE WITNESS: Sure.
13      (Momentarily off the record.)
14  BY MR. HENGEVELD:
15  Q   Did you research any caselaw, or secondary sources, in
16      order to prepare your report, or provide your opinions
17      in this case?
18  A   Caselaw, or secondary sources, yes.
19  Q   What issues or topics --
20  A   I think --
21  Q   -- did you research caselaw, or secondary sources, in
22      order to prepare your report?
23  A   I think I cited them in here. So I cited -- just
24      flipping through my report -- I cited some secondary
25      sources on page 5, under B(1), and I cited a case on

Page 78

1   page 8, under Section D(2), and then on page 9, under
2   E(1), I cited some secondary sources.
3       MR. GOULDER: Have you finished your answer?
4       THE WITNESS: Yes.
5       MR. GOULDER: 'Cause I was just going to say,
6   for completeness, you had mentioned some follow-up
7   analysis on the construction exemption.
8       THE WITNESS: Well, what we talked about,
9   earlier, sure. In response to your question, earlier, I
10  looked up, briefly, some of the caselaw that exists on
11  the construction industry exemption.
12      And, I guess, I can't rule out -- I mean, if
13  you're asking me what I've even looked at in the course
14  of -- I mean, I found these things that I cited, and I
15  don't -- I may have looked at some things, in the course
16  of finding these things, that I didn't cite that I just
17  don't remember, but these are the topics that I was
18  trying to support.
19  BY MR. HENGEVELD:
20  Q   And the documents that you have reviewed in preparation
21      for providing your opinions, in this case, do you
22      consider any particular document, or documents, more
23      critical and relevant to the opinions than others?
24  A   Yes.
25  Q   What documents are those that you consider to be more

Page 79

1   relevant or critical to your opinions?
2  A   I guess I list the most important as being the early
3      e-mail, in April of 2013, but also Mr. Weiss' entire
4      deposition, and Mr. Chaffee's entire deposition. Those
5      three things are more important, probably, than anything
6      else, for my conclusions.
7  Q   And, for the record, that e-mail was the Exhibit 7 that
8      we looked at --
9  A   Yes.
10  Q   -- today?
11  A   Yeah.
12  Q   You indicated that you reviewed the report of
13      Jordan Schreier?
14  A   Yes.
15  Q   Do you have any disagreements with the content of what
16      is in his report?
17      MR. GOULDER: Object to the form. Overly
18  broad.
19      THE WITNESS: Yes, I do.
20  BY MR. HENGEVELD:
21  Q   As you sit here today, is there anything specific that
22      stands out as being objectionable in his report?
23      MR. GOULDER: And the record should show that
24      the report is not in front of the witness. If you want
25      a detailed answer, I think that would be the fair thing

Page 80

1   to do.
2       (Marked for identification:
3       Deposition Exhibit No. 57.)
4  BY MR. HENGEVELD:
5  Q   I'm handing you what's been marked as Exhibit 57, which
6      is the report of Jordan Schreier.
7       Can you answer the question now --
8  A   Thank you.
9  Q   -- with that report?
10  A   Sure. So I will -- so I disagree with the conclusion at
11      the top of page 8, that Jaffe, Raitt's standard
12      satisfied the standard of care, et cetera.
13      I guess I'll just highlight the conclusions
14  that I disagree with, rather than every specific
15  subsection. I disagree with the conclusion on page 10,
16  that Jaffe, Raitt did not represent SSL Assets.
17      I disagree with the conclusion on page 11, in
18  E -- I disagree with the conclusion on page 11, in E,
19  that an employer that is aware of the potential for
20  multiemployer pension plan withdrawal liability can make
21  changes to its controlled group, potentially mitigating
22  potential withdrawal liability.
23      I disagree with that to the extent that it
24  implies -- which I think it does -- that the employer
25  can do that with any degree of intentionality, as



ANDREW W. STUMPFF
COHEN vs JAFFE

February 09, 2017
81–84

Page 81

1    opposed to an accidental side effect.
2          I disagree -- I -- I have no opinion on the
3    premature conclusion on page 12 in F. That's not within
4    the scope of my opinions.
5  Q  Do you know how many hours you spent preparing for your
6    deposition today?
7  A  I will guess eight.
8  Q  Are any of the publications that you have authored,
9    during the last 10 years, related to controlled group
10   liability?
11 A  It's discussed in two of the case books.
12 Q  Which are those?
13 A  Employee Benefits and Executive Compensation that came
14   out in 2011. And then the one I'm a coauthor with
15   Langbein and Pratt, which came out in 2015.
16         And then let me just review the rest of the
17   list to see if any of the others --
18         (Witness reviewing document.)
19         And I don't think any of the others were.
20 Q  Have the courses that you have taught at the
21   University of Michigan, or the University of Alabama,
22   involved ERISA topics, and, in particular, pension
23   withdrawal liability, or controlled group liability?
24 A  All of the above, and, in particular, I typically issue
25   a fairly detailed exercise on the brother-sister group.

Page 82

1  Q  You've described yourself as a lecturer at the
2    University of Michigan --
3  A  Right.
4  Q  -- law school?
5  A  That's a title at U of M.
6  Q  How does that relate to a professor, or an associate
7    professor, or assistant professor?
8  A  It's far below them. So it's -- my understanding is
9    they have, you know, a whole hierarchy of professors,
10   low professors, associate professors, et cetera.
11         They have something they call an adjunct
12   professor, and I'm not sure what -- I honestly don't
13   know what the requisites are to be called an adjunct
14   professor.
15         And then they have a title called "lecturer,"
16   and I think that's the function of their collective
17   bargaining agreements.
18 Q  Are the courses that you provided at the University of
19   Michigan for credit?
20 A  Yes.
21 Q  What was the title of that class, or classes, that
22   you --
23 A  Employee Benefits and Executive Compensation.
24 Q  And what about the title of the classes at the
25   University of Alabama?

Page 83

1  A  The same. Actually, I should amend that. I think at
2    least one or two years, the one at Alabama has been
3    titled "Deferred Compensation," but the content was the
4    same.
5          MR. HENGEVELD: All right. I don't have any
6    further questions. Thank you.
7          THE WITNESS: Thank you.
8          MR. GOULDER: The only thing I'll -- just to
9    put on the record is we had exchanged e-mails, Jeff, as
10   you recall, about whether Jaffee is obligated to
11   compensate, you know, Mr. Stumpff, not only for his time
12   here, but his time preparing.
13         It is our view that the requirement is that
14   they pay for the preparation time as well. We will
15   submit a bill for both. You'll pay what you're going to
16   pay, and if it's less than the full amount, we'll take
17   it up with the judge at the appropriate time.
18         MR. HENGEVELD: And, for the record, yes, we
19   did indicate that we would pay for the time for today's
20   deposition, sitting in the deposition, and we are
21   contesting that it is our obligation, under the federal
22   court rules, to provide compensation for his prep time.
23         THE WITNESS: So can I -- is this a good time
24   to raise the rate?
25         MR. GOULDER: Oh, go ahead.

Page 84

1          THE WITNESS: So you handed me this exhibit,
2    and I just realized that I -- I, or someone, has made a
3    mistake. So this --
4          MR. GOULDER: "This exhibit" being which?
5          THE WITNESS: The engagement letter. So it
6    recites a fee of $450 an hour, and I said, in my report,
7    that it's $400 an hour, and I don't know which is
8    mistaken. One of them is mistaken, but I just don't
9    know --
10         MR. HENGEVELD: All right.
11         THE WITNESS: -- as I sit here.
12   I can find out.
13         MR. GOULDER: The bills would show.
14         THE WITNESS: That's true. The bills will
15   show it.
16         MR. HENGEVELD: To be clear on the record,
17   then, the invoice that I have, for September 2016,
18   reflects a $400-an-hour rate.
19         THE WITNESS: That's what I thought.
20         MR. HENGEVELD: Is that the correct rate?
21         THE WITNESS: That's the correct rate.
22         MR. HENGEVELD: Thank you.
23         MR. GOULDER: Okay. We're finished.
24         MR. HENGEVELD: I have no further questions.
25         MR. GOULDER: We'll read and sign the



ANDREW W.  STUMPFF
COHEN vs JAFFE

February 09, 2017
85—88

Page 85

1  transcript.
2        (The deposition was concluded at 10:28 a.m.)
3              (Signature reserved.)
4
5
6                    * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1  STATE OF MICHIGAN )
                   ) SS
2  COUNTY OF MACOMB )
3              CERTIFICATE OF NOTARY PUBLIC
4        I, Kelli A. Murphy, a Notary Public in and
5  for the above county and state, do hereby certify that
6  this transcript is a complete, true, and correct record
7  of the testimony of the witness held in this case.
8        I also certify that prior to taking this
9  deposition, the witness was duly sworn or affirmed to
10  tell the truth.
11        I further certify that I am not a relative or
12  an employee of or an attorney for a party; and that I am
13  not financially interested, directly or indirectly, in
14  the matter.
15        In witness whereof, I hereby set my
16  hand this day, Friday, February 17, 2017.
17
18
19
20
21  Kelli A. Murphy, CSR-7768
22  Notary Public, Macomb County, Michigan
23  Signing in Wayne County, Michigan
24  My Commission expires:  January 7, 2018
25

Page 87

1                    DEPOSITION ERRATA SHEET
2
3
4  Our Assignment No. J0510055
5  Case Caption:  Cohen  v  Jaffee, et al.
6
7
8            DECLARATION UNDER PENALTY OF PERJURY
9
10  I declare under penalty of perjury that I have read the
11  entire transcript of my deposition taken in the captioned
12  matter or the same has been read to me, and the same is true
13  and accurate, save and except for changes and/or corrections,
14  if any, as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these changes as
16  if still under oath.
17
18  Signed on the _____ day of_____, 2017
19
20  _____
21              Andrew W. Stumpff
22
23
24
25

Page 88

1                    DEPOSITION ERRATA SHEET
2
3  Page No._____Line No._____Change to:_____
4  _____
5  Reason for change:_____
6  Page No._____Line No._____Change to:_____
7  _____
8  Reason for change:_____
9  Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21
22
23  SIGNATURE:_____DATE:_____
24              Andrew W. Stumpff
25



ANDREW W.  STUMPFF
COHEN vs JAFFE

Page 89

```
 1                   DEPOSITION ERRATA SHEET
 2
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21
22
23   SIGNATURE:_____DATE:_____
24              Andrew W. Stumpff
25
```

